Rehearing en banc granted by order
filed 12/28/99; published opinion
issued 6/24/99 is vacated.

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

GRANVILLE AMOS; HARVEY W.
BLOXOM; MICHAEL A. HOLT; TEDDY
T. JONES; CHARLES MADISON;
HOWARD MEGGINSON; BORIS
PRYMERMAN; GARY RALPH; JOHN
SMITH; MICHAEL HILMAN SMITH;
WILLIAM LEWIS SMITH; CALVIN J.
WHITING; DENNIS BRIAN ABSHER,
Plaintiffs-Appellants,

UNITED STATES OF AMERICA,
Intervenor,

and

WINFRIED LEE RHODES,
Plaintiff,

v.

No. 96-7091

MARYLAND DEPARTMENT OF PUBLIC
SAFETY AND CORRECTIONAL SERVICES;
ROXBURY CORRECTIONAL INSTITUTION,
Hagerstown, Maryland; RICHARD
LANHAM, SR., in his official capacity
as Commissioner, Maryland
Division of Correction; JOHN P.
GALLEY, in his official capacity as
Warden, Roxbury Correctional
Institution; RONALD MOATS, Warden,
Roxbury Correctional Institution;
WILLIAM SMITH, Warden, Maryland
House of Correction,
Defendants-Appellees.

NATIONAL ADVISORY GROUP FOR
JUSTICE; THE ASSOCIATION OF STATE
CORRECTIONAL ADMINISTRATORS,
<u>Amici Curiae.</u>

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, Chief District Judge.
(CA-91-508-JFM, CA-95-524-JFM)

Argued: December 4, 1998

Decided: June 24, 1999

Before MURNAGHAN and WILLIAMS, Circuit Judges,
and CLARKE, Senior United States District Judge
for the Eastern District of Virginia, sitting by designation.

_____

Reversed and remanded by published opinion. Senior Judge Clarke
wrote the opinion. Judge Murnaghan wrote a concurring opinion.
Judge Williams wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Marjorie Lynn Rifkin, National Prison Project, ACLU
FOUNDATION, Washington, D.C., for Appellants. Seth Michael
Galanter, UNITED STATES DEPARTMENT OF JUSTICE, Wash-
ington, D.C., for Intervenor. Maureen Mullen Dove, Assistant Attor-
ney General, Baltimore, Maryland, for Appellees. Marci A. Hamilton,
Professor of Law, BENJAMIN N. CARDOZO SCHOOL OF LAW,
New York, New York, for Amicus Curiae ASCA. **ON BRIEF:** Mar-
garet Winter, Elizabeth Alexander, Jerome W. Wesevich, National
Prison Project, ACLU FOUNDATION, Washington, D.C., for Appel-

2

lants. Bill Lann Lee, Acting Assistant Attorney General, Jessica Dunsay Silver, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor. J. Joseph Curran, Jr., Attorney General of Maryland, Stephanie Lane-Weber, Assistant Attorney General, David P. Kennedy, Assistant Attorney General, Baltimore, Maryland, for Appellees. Barbara E. Ransom, Kirsten E. Keefe, THE PUBLIC INTEREST LAW CENTER OF PHILADELPHIA, Philadelphia, Pennsylvania, for Amicus Curiae Advisory Group.

_____

## OPINION

CLARKE, Senior District Judge:

Thirteen disabled Maryland state prisoners (collectively Appellants) incarcerated at Roxbury Correctional Institution (RCI) at Hagerstown, Maryland, brought suit against RCI, the Maryland Department of Public Safety and Correctional Services (MDPSCS), Richard Lanham, the Commissioner of the Maryland Division of Correction, and John P. Galley, the Warden of RCI (collectively Appellees), alleging that Appellees violated Title II of the Americans with Disabilities Act (ADA), see 42 U.S.C.A.§§ 12131-12165 (West 1995 & Supp. 1997); and § 504 of the Rehabilitation Act of 1973, see 29 U.S.C.A. § 794 (West Supp. 1997). This case was originally before the Court on appeal from a grant of summary judgment in favor of Appellees. Based on our analysis of the statutes under the clear statement rule, and in light of our decision in Torcasio v. Murray, 57 F.3d 1340 (4th Cir. 1995), we found that the ADA and the Rehabilitation Act do not apply to state prisons. We affirmed the judgment of the district court, see Amos v. Md. Dept. of Pub. Safety & Corr. Serv., 126 F.3d 589 (4th Cir. 1997) (Amos I), and Appellants petitioned the Supreme Court of the United States for certiorari. On June 22, 1998, the Supreme Court granted certiorari, vacated our opinion in Amos I, and remanded in light of the Supreme Court's decision in Pennsylvania Dept. of Corr. v. Yeskey, 118 S.Ct. 1952 (1998). See Amos v. Md. Dept. of Pub. Safety & Corr. Serv., 118 U.S. 2339 (1998).[1]

_____

[1] Appellants also brought claims based on alleged violations of their constitutional rights under the Eighth Amendment of the United States

3

I.

In Yeskey, a state prisoner had been denied admission to a Motivational Boot Camp Program because of his medical history of hypertension. The Supreme Court affirmed the Third Circuit's opinion that the ADA does apply to state prisons, stating explicitly that Congress drafted the ADA in unambiguous terms. Based on the unambiguous text of the statute, the Court held that Congress clearly intended to include state prisons within the scope of the ADA. See Yeskey, 118 S.Ct. at 1953-54. Although the Court ruled that Congress intended for the ADA and Rehabilitation Act to apply to state prisons, the Court expressly declined to rule on the issue of whether application of the ADA to state prisons is a constitutional exercise of Congress' legislative power, either under § 5 of the Fourteenth Amendment or the Commerce Clause. Id. at 1956.

By Order of July 10, 1998, after this Court regained jurisdiction over Amos I on remand, we directed both parties to file supplemental briefs addressing the issue of the constitutionality of the application of the ADA and Rehabilitation Act to state prisons. Both Appellants and Appellees, as well as the United States as intervenor and several amicus curiae, filed briefs addressing the issue. **2** Being bound to reject

_____

Constitution. The district court granted summary judgment in favor of Appellees on that claim, as well, and we affirmed. See Amos I, 126 F.3d at 611. Since Appellants did not petition the Supreme Court for certiorari on this Court's ruling on the Eighth Amendment claims, these claims are no longer before the Court and will not be addressed further.

**2** Although the issue of the constitutionality of applying the ADA and Rehabilitation Act to state prisons was not raised below, we exercise our limited discretion to consider the issue on appeal in light of the fact that the constitutionality of this federal statute is purely a question of law, both parties have fully briefed the issue, and its resolution at this stage will advance and expedite the progress of this litigation. See United States v. Presley, 52 F.3d 64, 67 (4th Cir.), cert. denied, 516 U.S. 891 (1995); Pinney Dock & Transport Co. v. Penn Cent. Corp., 838 F.2d 1445, 1461 (6th Cir.), cert. denied, 488 U.S. 880 (1988) (when resolution of issue not presented below will "materially advance the progress of [the] already protracted litigation, [courts of appeal] should address it" if the issue has been "presented with sufficient clarity and completeness"); Hormel v. Helvering, 312 U.S. 552, 557 (1941) (court of appeals has discretion to deviate from normal rule of procedure and hear issues not raised below in exceptional cases or particular circumstances).

our panel's previous opinion in Amos I, and to follow instead the direction of the Supreme Court,**3** we must now base our analysis of the statutes' constitutionality on the premise that Congress did intend for the ADA and the Rehabilitation Act to apply to state prisons. Under such analysis, we hold that Congress did in fact act constitutionally when it enacted the ADA and the Rehabilitation Act pursuant to its enforcement powers under § 5 of the Fourteenth Amendment with the intent that the statutes apply to state prisons.

Before we go further, however, we note that with our holding today, we continue to have our reservations, stated in Torcasio and Amos I, about the far-reaching and serious implications for the management of state prisons that will result from application of these Acts to those institutions. We agree with the Seventh Circuit that

> [i]t might seem absurd to apply the Americans with Disabilities Act to prisoners. Prisoners are not a favored group in society; the propensity of some of them to sue at the drop of a hat is well known; prison systems are strapped for funds; the practical effect of granting disabled prisoners rights of access that might require costly modifications of prison facilities might be the curtailment of educational, recreational, and rehabilitative programs for prisoners, in which event everyone might be worse off . . . .

Crawford v. Indiana Dept. of Corrections, 115 F.3d 481, 486 (7th Cir. 1997). Our job today, however, is simply to decide whether Congress, in pursuing its clear objective, exceeded its constitutional authority. Since we hold that Congress acted constitutionally under its Fourteenth Amendment enforcement powers, our opinion as to the pru-

_____

**3 See Ethridge v. Norfolk & Western Ry. Co.**, 9 F.3d 1087, 1090 (4th Cir. 1993) ("A decision of a panel of this court becomes the law of the circuit and is binding on other panels unless it is overruled by a subsequent en banc opinion of this court or a `superceding contrary decision of the Supreme Court'") (quoting Busby v. Crown Supply, Inc., 896 F.2d 833, 840-41 (4th Cir. 1990)).

dence of Congress' choice to make the statutes applicable to state prisons is irrelevant.**4**

II.

When Congress enacted the ADA, it "invoke[d] the sweep of congressional authority, including the power to enforce the fourteenth amendment . . . in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C.A. § 12101(b)(4) (West 1995). Thus, we begin our analysis with the Equal Protection Clause and § 5 of the Fourteenth Amendment, noting, as we did in Amos I, that "because Congress has directed that Title II of the ADA be interpreted in a manner consistent with §504 of the Rehabilitation Act, see 42 U.S.C.A.§§ 12134(b), 12201(a) (West 1995), we combine the analysis of the prisoners' ADA and Rehabilitation Act claims." Amos I, 126 F.3d at 593, n.2 (citing Shafer v. Preston Mem'l Hosp., 107 F.3d 274, 276, n.3 (4th Cir. 1997); Doe v. University of Md. Med. Sys. Corp. , 50 F.3d 1261, 1264, n.9 (4th Cir. 1995); Tyndall v. National Educ. Ctrs., Inc., 31 F.3d 209, 213, n.1 (4th Cir. 1994)). We also note that although § 504 of the Rehabilitation Act does not state explicitly that it was enacted pursuant to § 5 of the Fourteenth Amendment, the Supreme Court has stated in dicta that "[t]he Rehabilitation Act was passed pursuant to § 5 of the Fourteenth Amendment." Welch v. Texas Dept. of Highways & Pub. Transp., 483 U.S. 468, 472, n.2 (1987) (citing Atascadero State Hospital v. Scanlon, 473 U.S. 234, 244-45, n.4 (1985)).

A.

Congress has the power to protect classes of persons from arbitrary discrimination by the States. This power is rooted in the Equal Protec-

_____

**4** Also irrelevant to our determination of the statutes' constitutionality is the possibility of an increase in frivolous prisoner litigation. As the United States aptly states in its supplemental reply brief, "Congress has elected to address that separate problem of frivolous prisoner suits by enacting the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat, 1321 (1996), instead of by excluding prisoners from the ADA's protections." (Intervenor S. Reply Br. at 16, n.10).

tion Clause of § 1 of the Fourteenth Amendment to the United States Constitution which guarantees that no State shall "deny to any person within its jurisdiction the equal protection of the laws." The Supreme Court has stated that the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985). The Supreme Court has specifically found that the Equal Protection Clause protects the physically and mentally disabled from arbitrary discrimination by the States, even though the disabled do not themselves constitute a suspect or quasi-suspect class of persons. Id. at 446.

Section 5 of the Fourteenth Amendment grants to Congress the power to enforce the mandates of the Equal Protection Clause through legislation that is aimed at remedying or preventing violations of the Amendment. This remedial power has traditionally been quite broad, not only in the context of racial discrimination and voting rights, but in other areas of discrimination as well. See , e.g., City of Rome v. United States, 446 U.S. 156, reh'g denied , 447 U.S. 916 (1980); Fitzpatrick v. Bitzner, 427 U.S. 445 (1976); Oregon v. Mitchell, 400 U.S. 112 (1970), reh'g denied, 401 U.S. 903 (1971); Katzenbach v. Morgan, 384 U.S. 641 (1966); South Carolina v. Katzenbach, 383 U.S. 301 (1966); Ex parte Virginia, 100 U.S. 339, 345-46 (1879). In the voting rights context, the Supreme Court has declared § 5 to be "a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment." Katzenbach v. Morgan, 384 U.S. at 651.

Congress' enforcement power is not without limits, and the Supreme Court has recently attempted to define and clarify the limits of Congress' § 5 power in the case of City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157 (1997), where the Court stated that under § 5, "Congress' discretion is not unlimited, however, and the courts retain the power, as they have since Marbury v. Madison, to determine if Congress has exceeded its authority under the Constitution." Boerne, 117 S.Ct. at 2172. In Boerne, the Supreme Court struck down the Religious Freedom Restoration Act of 1993 (RFRA), see 42 U.S.C.A. § 2000bb et seq. (West 1994 & Supp. 1998), an act which Congress passed pursuant to its Fourteenth Amendment enforcement

7

powers, and in direct response to the Supreme Court's decision of Employment Div., Dept. of Human Resources of Oregon v. Smith, 494 U.S. 872, reh'g denied, 496 U.S. 913 (1990). In Smith, the Court had held that the Free Exercise Clause of the First Amendment does not require States to justify by a compelling interest generally applicable, neutral laws that coincidentally burden religious practices. See Smith, 494 U.S. at 884-86. Thus, Smith essentially lowered the standard for judicial review of generally applicable, neutral laws that burden religion. In direct response to Smith, and in an attempt to remedy supposed harms to the free exercise of religion, Congress passed RFRA, which required all laws that burden a group's religion, even neutral laws of general applicability, to be narrowly tailored and justified by a compelling interest. See 42 U.S.C. § 2000bb-1.

In striking down RFRA, the Supreme Court admonished that § 5 of the Fourteenth Amendment grants Congress only the power to enforce the Fourteenth Amendment and not the power to define the substance of the Amendment since "[t]he design of the Amendment and the text of § 5 are inconsistent with the suggestion that Congress has the power to decree the substance of the Fourteenth Amendment's restrictions on the States." Boerne, 117 S.Ct. at 2164. Thus, Congress' power is remedial and not substantive in nature. The Boerne Court had the foresight to recognize that distinguishing between laws that remedy or prevent unconstitutional conduct and laws that operate to define constitutional rights substantively is a difficult task, and in an effort to guide lower courts in analyzing laws passed under § 5, the Court crafted its "congruence and proportionality" test for deciding whether Congress has acted outside the scope of the Fourteenth Amendment. In order for laws to qualify as remedial under the Fourteenth Amendment, according to Boerne, "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." Id. (internal quotation and citation omitted). Thus, as the Tenth Circuit has aptly interpreted Boerne, "[i]f the legislation at issue imposes burdens far greater than the seriousness of any demonstrated constitutional injury requiring such measures, then the legislation does not remediate the constitutional violation but creates substantive change in constitutional protections." Migneault v. Peck, 158 F.3d 1131, 1137 (10th Cir. 1998) (citing Boerne, 117 S.Ct. at 2163-70).

8

The Court applied its congruence and proportionality test to RFRA and found that the broad sweeping and constitutionally demanding tests set up by RFRA totally lacked the necessary congruence and proportionality to the harm the statute purported to remedy. Finding no evidence in the record of "modern instances of generally applicable laws passed because of religious bigotry," Boerne, 117 S.Ct. at 2169, the Court found the statute to be "so out of proportion to a supposed remedial or preventative object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." Id. at 2170. Thus, by creating substantive and not remedial legislation, Congress exceeded its remedial legislative powers under § 5 of the Fourteenth Amendment.

Since Congress purported to exercise its Fourteenth Amendment enforcement powers when enacting the ADA, see 42 U.S.C.A. § 12101(a)(7), (b)(4) (West 1995), we analyze the question of its constitutionality under Boerne's test for congruence and proportionality. Having examined, among other things, the statute itself, portions of its legislative history, see 42 U.S.C. § 12101; S. Rep. No. 101-116, at 7-8 (1989); H.R. Rep. No. 101-485, pt. 2, at 28-31 (1990); H.R. Rep. No. 101-485, pt.1, at 24 (1990), and the opinions of our sister circuits that have addressed the issue, see Crawford v. Indiana Dep't of Corrections, 115 F.3d 481 (7th Cir. 1997); Clark v. California, 123 F.3d 1267 (9th Cir. 1997), cert. denied, 118 S.Ct. 2340 (1998); Coolbaugh v. Louisiana, 136 F.3d 430 (5th Cir.), cert. denied, 119 S.Ct. 58 (1998); Kimel v. Florida Bd. of Regents , 139 F.3d 1426 (11th Cir. 1998), cert. granted, 67 U.S.L.W. 3464 (U.S. Jan. 25, 1999) (No. 98-791); Seaborn v. Florida, 143 F.3d 1405 (11th Cir. 1998), cert. denied, 119 S.Ct. 1038 (1999); see also Autio v. AFSCME Local 3139, 157 F.3d 1141 (8th Cir. 1998) (en banc), we hold that Congress did not exceed its authority under § 5 of the Fourteenth Amendment when it enacted the ADA to remedy discrimination against disabled persons, including disabled state prisoners.

B.

The first question to be decided is whether the ADA, as enacted, is remedial or substantive in nature. We note again that the Supreme Court has found that the Equal Protection Clause protects the physically and mentally disabled from arbitrary discrimination by the

9

States. City of Cleburne, 473 U.S. at 446. It also protects prisoners from arbitrary discrimination. See Turner v. Safley, 482 U.S. 78, 84 (1987) ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution."). As the Seventh Circuit has aptly noted, "[a]lthough the special conditions of the prison setting license a degree of discrimination that would not be tolerated in a free environment, there is no general right of prison officials to discriminate against prisoners on grounds of race, sex, religion, and so forth." Crawford, 115 F.3d at 486 (7th Cir. 1997) (internal citations omitted). Thus, if arbitrary discrimination against disabled inmates exists, then Congress has the power to enact legislation that remedies or prevents such violations of disabled inmates' equal protection rights.

When enacting the ADA, Congress made several findings of both past and present discrimination against the disabled in the country's general population that it determined violated the Equal Protection Clause. See 42 U.S.C. § 12101(a)(2)-(a)(3), (a)(5)-(a)(6); H.R.Rep. No. 101-485, pt.2, at 22, 30, 42 (1990), reprinted in 1990 U.S.C.C.A.N. 267, 303, 311-12, 324. Congress determined that "the exclusion of persons with disabilities from government facilities, programs, and benefits was a result of past and on-going discrimination." (Intervenor S. Br. at 18). We are compelled to give some deference to the record of Congress' factual findings, and to Congress' determination that the ADA is an appropriate remedy to the harms it found to exist. We reiterate the Supreme Court's observation that "the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern" and as such "Congress must have wide latitude in determining where it lies. . . ." Boerne, 117 S.Ct. at 2164. Further, with respect to the disabled, the Court has stated that "[h]ow this large and diversified group is to be treated under the law is a difficult and often a technical matter, very much a task for legislators guided by qualified professionals and not by the perhaps ill-informed opinions of the judiciary." City of Cleburne, 473 U.S. at 442-43. Thus, while we are mindful that our deference to the judgment of Congress must not be blind, we are also aware that even after Boerne, a great deal of deference must still be given to Congress, especially in the face of a fully developed evidentiary record of discrimination. Such a record exists with respect to the ADA. Unlike RFRA, which the Court found to be totally unsupported by evidence or examples of present-day reli-

10

gious discrimination by States, see Boerne, 117 S.Ct. at 2169, the ADA's legislative history is replete with examples of discrimination against the disabled in the free world.

Even if the legislative record lacked specific findings of discrimination with regard to state prison inmates, that would not change our finding that the ADA is remedial and not substantive legislation with respect to state prisons.**5** It would be obtuse for us to believe that the discrimination Congress found to be so pervasive in the free world automatically stops at the prison gates. Furthermore, as the Seventh Circuit has noted,

> [disabled prisoners] have the same interest in access to the programs, services and activities available to the other inmates of their prison as disabled people on the outside have to the counterpart programs, services, and activities available to free people. They have no right to more services than the able-bodied inmates, but they have a right, if the Act is given its natural meaning, not to be treated even worse than those more fortunate inmates.

Crawford, 115 F.3d at 486.

In light of the legislative history and the stated purpose of the ADA, we must conclude that the ADA, even with respect to state prison inmates, is indeed adequately justified as remedial legislation and therefore fully within the scope of Congress' enforcement power under the Fourteenth Amendment.

_____

**5** In any event, Congress did gather evidence on arbitrary discrimination against the disabled in prisons. Several House and Senate subcommittees received into evidence the United States Commission on Civil Rights Report, Accommodating the Spectrum of Individual Abilities (1983). See Sen. Rep. No. 101-116 at 6 (1989); H.R. Rep. No. 101-485 (II) at 28 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 310. This report pointed to "[i]nadequate treatment and rehabilitation programs [for the disabled] in penal and juvenile facilities," and "[i]nadequate ability to deal with physically handicapped accused persons and convicts (e.g., accessible jail cells and toilet facilities)."

11

We cannot, however, stop our inquiry with the mere conclusion that the ADA is remedial in nature. We must also decide whether the sweep of the ADA's remedy takes it outside the scope of the Fourteenth Amendment. We believe it does not. The scope of the ADA is limited to the unconstitutional conduct that it is aimed at preventing. It does not, as RFRA did, "[displace] laws and [prohibit] official actions of almost every description and regardless of subject matter." Boerne, 117 S.Ct. at 2170. Even if, however, the application of the ADA to state prisons may incidentally affect some conduct by prison officials that is otherwise constitutional, such an incidental burden does not necessarily invalidate the statute. As the Boerne Court stated, "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into `legislative spheres of autonomy previously reserved to the States.'" Id. at 2169 (quoting Fitzpatrick v. Bitzner, 427 U.S. 445, 455 (1976)). That penal institutions may have to modify some of their otherwise constitutional practices in order to comply with the ADA does not make the ADA unconstitutional in light of the discrimination it aims to curtail.

We cannot lose sight of the fact that the ADA limits itself by only requiring that a penal institution make "reasonable" accommodations for the disabled that are not unduly burdensome. The ADA, unlike RFRA, is not attempting to impose a strict scrutiny standard on all state laws or actions in the absence of evidence of discrimination. The Supreme Court objected in large part to RFRA because"[t]he stringent test RFRA demands of state laws reflects a lack of proportionality or congruence between the means adopted and the legitimate end to be achieved." Boerne, 117 S.Ct. at 2171. The ADA dictates no such stringent test. Rather, the ADA seeks to impose a scheme that will adequately prevent or remedy a well-documented problem of discrimination without unduly burdening the state prison system. It subjects some laws and official actions to a "reasonable accommodation" requirement only to the point that the accommodation is not unduly burdensome. Such a scheme, unlike RFRA, does not redefine or expand prisoners' constitutional protections, but simply proportionally acts to remedy and prevent documented constitutional wrongs.

12

C.

Appellees agree that in design, the ADA passes muster as remedial and not substantive legislation, but they argue that the effect of applying the ADA to state prison inmates will take it out of the scope of § 5 unless this Court follows the lead of the Ninth Circuit and holds that the ADA is only constitutional if it is limited by the holding in Turner v. Safley, 482 U.S. 78 (1987).**6** See Gates v. Rowland, 39 F.3d 1439 (9th Cir. 1994).

This Court has already commented unfavorably on the Ninth Circuit's approach in Gates. See Amos I, 126 F.3d at 600. We still decline to use that approach now. For us to graft the standards for review of prisoners' constitutional claims onto these statutes would be for us essentially to rewrite what the Supreme Court has deemed to be unambiguous statutory language. See Yeskey , 118 S.Ct. at 1953-53. We cannot engage in such apractice. See, e.g., Seminole Tribe of Florida v. Florida, 517 U.S. 44, 75 (1996) ("Nor are we free to rewrite the statutory scheme in order to approximate what we think Congress might have wanted had it known that [the provision at issue] was beyond its authority. If that effort is to be made, it should be made by Congress, and not by the federal courts."); Honig v. Doe, 484 U.S. 305, 323 (1988) ("The language of [the statute] is unequivocal. . . . Faced with this clear directive, . . . we decline petitioner's invitation to rewrite the statute."); Louisiana Public Service Com'n v. F.C.C., 476 U.S. 355, 376 (1986) ("As we so often admonish, only Congress can rewrite this statute."). Our failure to borrow the Turner standard does not condemn the ADA in the prison context. For the reasons discussed above, even as applied to prisons we find that the ADA is a valid exercise of Congress' Fourteenth Amendment enforcement power under the Boerne congruence and proportionality test.

Appellees next contend that the Department of Justice Regulations (regulations) accompanying the ADA and § 504 of the Rehabilitation

_____

**6 Turner** addressed the standard of judicial review of state prison inmates' constitutional claims of violations of equal protection. The Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is`reasonably related' to legitimate penological interests." Turner v. Safley, 482 U.S. at 89.

13

Act render the statutes too broad-sweeping to survive analysis under Boerne, and urge us to reject the regulations as they apply to state prisons. (Appellants' S. Br. at 23, n.14).

With regard to the amount of deference due to regulations promulgated by administrative agencies, the Supreme Court has stated that if, in an unambiguous statute, Congress makes "an express delegation of authority to [an] agency to elucidate a specific provision of [a] statute" then "[s]uch legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Chevron v. Natural Resources Defense Council, 467 U.S. 837, 843-44 (1984) (citations omitted).

In the case of the ADA and § 504 of the Rehabilitation Act, statutes the Supreme Court has declared to be unambiguous, Congress has made an express delegation by directing the Department of Justice (DOJ) to promulgate implementing regulations for the statutes. See 29 U.S.C.A. § 794(a) (West 1999); 42 U.S.C.A.§ 12134 (West 1995). Congress incorporated § 504 of the Rehabilitation Act's implementing regulations into Title II of the ADA. See 42 U.S.C.A. § 12201(a) (West 1995). As such, this Court must afford a great deal of deference to the DOJ's interpretation of these statutes, even if that interpretation is somewhat detailed and intrusive into the normal operations of prisons. We cannot reject the regulations wholesale because they are neither clearly contrary to Congress' "unambiguous" intent that these statutes apply to state prisons, nor are they arbitrary or capricious. In fact, many of the regulations have a certain degree of flexibility that will allow state prison authorities the latitude to exercise their own judgment in devising a scheme that will satisfy both prison authorities' concerns for issues such as safety and Congress' demand for reasonable accommodation. The regulations provide methods by which entities will be sure to come into compliance with the statutes, but they allow for entities such as state prisons to develop their own methods of complying with the statutes.[7]  This is not to say that all the

_____

[7] As United States correctly points out in its supplemental reply brief, (Intervenor S. Reply Br. at 14), Regulation 28 C.F.R. § 35.151(a) states that construction or alterations made after January 26, 1992, should be "readily accessible to and usable by individuals with disabilities." The

14

regulations promulgated under the ADA will be constitutional. The constitutionality of each regulation will require a careful case-by-case analysis of each regulation as challenges to specific regulations arise.**8**

In finding that the regulations in general do not extend the reach of the ADA too far, we are mindful of the traditional policy of judicial restraint with regard to decisions involving prison administration in the context of constitutional rights, see Procunier v. Martinez, 416 U.S. 396, 405 (1974), overruled on other grounds by Thornburgh v. Abbott, 490 U.S. 401 (1989); Turner v. Safley, 482 U.S. at 84-85, and the deference due to prison authorities with regard to their decisions on how best to administer their institutions. In counseling deference to appropriate prison authorities in the context of prisoners' constitutional rights, the Supreme Court has recognized that"[r]unning a

_____

regulation states construction that complies with either of two codes will comply with the ADA. The regulation also dictates, however, that "[d]epartures from particular requirements of either standard by the use of other methods shall be permitted when it is clearly evident that equivalent access to the facility or part of the facility is thereby provided." 28 C.F.R. § 35.151(c).

**8** We feel compelled to note here that since this panel heard this case, the Fourth Circuit has announced its opinion in the case of Brown v. North Carolina Div. of Motor Vehicles, 166 F.3d 698, 705 (4th Cir. 1999), reh'g en banc denied. In Brown , the Fourth Circuit struck down as unconstitutional a regulation promulgated under the ADA. After careful consideration of the opinion in Brown, we conclude that the decision in Brown does not control the issue before us in Amos. The panel in Brown considered the validity of a specific regulation promulgated under the ADA, and not the constitutionality of the ADA itself as applied to state agencies. Although the majority in Brown  does question Congress' authority with respect to the ADA itself, see Brown, 166 F.3d at 708, the majority does not go so far as to hold that the ADA is unconstitutional. Therefore, we continue to adhere to our position that Congress acted within its § 5 authority when it enacted the ADA with the intent that it apply to state prisons. We emphasize again, however, that in affirming Congress' general exercise of its authority in adopting the ADA with the intent that it apply to state prisons, we do not automatically affirm the constitutionality of all regulations promulgated under the ADA by the DOJ.

15

prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of the government." Turner v. Safley, 482 U.S. at 84-85.

While in the case of the ADA and the Rehabilitation Act we are concerned with the interpretation of statutory and not constitutional rights, and while we still decline to graft the standard for constitutional claims onto the ADA and Rehabilitation Act, we nonetheless feel that in the special context of prison administration, prison officials' judgments of what is "reasonable" or"undue" with regard to prisons are due some amount of deference. We find it appropriate to note here our agreement with the Seventh Circuit's statement that

> [t]erms like "reasonable" and "undue" are relative to circumstances, and the circumstances of a prison are different from those of a school, an office, or a factory, as the Supreme Court has emphasized in the parallel setting of prisoner' constitutional rights. E.g., Turner v. Safley . . . 482 U.S. at 84-91, 107 S.Ct. at 2259-63.

Crawford, 115 F.3d at 487. Thus, while courts deciding the meaning of "reasonable" and "undue" should afford the necessary amount of deference to the DOJ and its regulations, the courts should also consider the learned opinions of the prison experts charged with running the prisons.

This permissible deference to prison authorities, however, must be balanced with the great deal of deference due the DOJ in this area, since Congress has spoken through the DOJ with respect to interpretation of the ADA. We note, however, that the courts cannot simply defer blindly to either the decisions of the DOJ or to those of prison officials. We emphasize that neither the DOJ nor prison authorities themselves ultimately determine what type of accommodation is "reasonable" or when an accommodation becomes an"undue burden" on a particular institution. Certainly there will be conflicts between the views of the DOJ and prison authorities with respect to what is a "reasonable accommodation," but it is and always has been the job of the courts to reconcile such conflicting interpretations by considering all the unique surrounding facts and circumstances and attempting to bal-

16

ance the interests at stake in making the ultimate statutory interpretation.

D.

For the reasons stated above, we hold that Congress acted within its constitutionally granted powers when it enacted the ADA and § 504 of the Rehabilitation Act pursuant to§ 5 of the Fourteenth Amendment.

III.

We next come to the issue of whether the application of the ADA and § 504 of the Rehabilitation Act is a valid exercise of Congress' authority under the Commerce Clause. We find it unnecessary to reach this issue, however, since we have already found the statutes to be a valid exercise of Congress' authority under the Fourteenth Amendment.[9]

IV.

Finally, we reach the issue of sovereign immunity. The State of Maryland is entitled under the 11th Amendment of the United States Constitution to immunity from suit under the ADA unless Congress has validly abrogated that immunity. The analysis is a two step process, since "[i]n order to determine whether Congress has abrogated the States' sovereign immunity, we ask two questions: first, whether Congress has unequivocally expressed its intent to abrogate the immunity; . . . and second, whether Congress has acted pursuant to a valid exercise of power." Seminole Tribe of Florida v. Florida, 517 U.S. at 55 (internal quotations and citations omitted).

The defense of sovereign immunity is not available to Appellees in this case, as Appellees concede in their brief. (Appellees' S. Reply Br.

_____

[9] Appellants urge us to rule on the constitutionality of § 504 of the Rehabilitation Act under the Spending Clause. Even if we did find it necessary to rule on this issue, which we do not, we would be unable to do so due to the lack of evidence in the record on the status of federal funding made available to and accepted by RCI.

17

at 37). Since neither party disputes that Congress, through 42 U.S.C. § 12202, unequivocally expressed its intent to abrogate the States' sovereign immunity under the ADA, and since we have held today that the ADA is a valid exercise of Congress' power under the Fourteenth Amendment, we rule that the State of Maryland's sovereign immunity has been validly abrogated and the State is subject to suit in this case. Since the District Court granted summary judgment in this case based on the incorrect conclusion that the ADA and Rehabilitation Act do not apply to state prisons, we do not have an adequately developed record of the facts surrounding the Appellants' statutory claims to make a determination about whether Appellees violated Appellants' statutory rights. We must, therefore, remand to the District Court for determination of the Appellants' statutory claims on their merits.

V.

For the foregoing reasons, we find that application of the ADA and the Rehabilitation Act to state prisons is a valid exercise of Congress' legislative powers under § 5 of the Fourteenth Amendment and that the Appellees are validly subject to suit under these statutes.

REVERSED AND REMANDED

MURNAGHAN, Circuit Judge, concurring:

I join Judge Clarke's judgment and opinion. I write separately only to recall the powerful sentiments of Justice Marshall and the grave nature of the discrimination at issue in this case. In his separate opinion in City of Cleburne v. Cleburne Living Center, 473 U.S. 432 (1985), Justice Marshall argued that the courts should pay special deference to evolving standards of equality as embodied in acts of Congress:

> history makes clear that constitutional principles of equality, like constitutional principles of liberty, property, and due process, evolve over time; what once was a "natural" and "self-evident" ordering later comes to be seen as an artificial and invidious constraint on human potential and freedom.

18

> Shifting cultural, political, and social patterns at times come to make past practices appear inconsistent with fundamental principles upon which American society rests, an inconsistency legally cognizable under the Equal Protection Clause. It is natural that evolving standards of equality come to be embodied in legislation. When that occurs, courts should look to the fact of such change as a source of guidance on evolving principles of equality.

Id. at 466 (Marshall, J., concurring in the judgment in part and dissenting in part) (citations omitted). This deference is especially appropriate in the often fact-based equal protection context[1] and given the command in City of Boerne v. Flores, 521 U.S. 507, 117 S. Ct. 2157 (1997), that we give wide latitude to Congressional judgments as to what legislation is needed to secure the guarantees of the Fourteenth Amendment, id. at 2163 & 2171.

In enacting the ADA, Congress gathered extensive evidence recognizing that the disabled had long been subjected to invidious discrimination, and had not enjoyed the equal protection under the law guaranteed by the Constitution. U.S. Const. amend. XIV, § 1. On several occasions in its argument the Appellees pointed out that the ADA often mandates changes based on differences of only a few inches -- e.g., in the width of a door frame or in the height of a toilet seat. By this argument the Appellees unwittingly revealed the accuracy of Congress' determination that unconstitutional invidious discrimination against the disabled abounds. Appellees are correct; often the difference between accommodating the disabled and leaving them segregated and excluded is only a difference of a few inches. But, for the disabled, "almost" is not good enough. From the perspective of a disabled American, the absence of these accommodations in a building, a hallway, a bathroom, or a state-run program is tantamount to a sign that says, "No disabled allowed." A state's failure to consider

---

[1] **Cf. Clark v. State of California** , 123 F.3d 1267, 1271 (9th Cir. 1997) (concluding that the Supreme Court's level of scrutiny for purposes of Equal Protection review does not define the boundaries of Congress' § 5 enforcement powers); Kimel v. State of Fla. Bd. of Regents, 139 F.3d 1426, 1441 (11th Cir. 1998) (Hatchett, C.J., concurring in the judgment in part and dissenting in part) (same).

these necessary and often minor accommodations when designing buildings and programs is invidious discrimination in a most pernicious form -- willful blindness. The state effectively tells the disabled, "As far as we are concerned you do not exist." Like so many in the rest of society, the state simply averts its eyes when confronted with a member of the disabled, and tries to ignore the person as the state goes about its business.

But this deliberate ignorance is unreasonable and irrational. The disabled are as much a part of society as are those of us fortunate enough not to be challenged. The need to have a ramp for a building and accessible toilets and showers is as evident as the need to have doors and bathrooms in the first place.**2** A state's decision to construct facilities and design programs as if the disabled are not a part of society stems from attitudes formed during a "`lengthy and tragic history' of segregation and discrimination," City of Cleburne, 473 U.S. at 461 (Marshall, J., concurring in the judgment in part and dissenting in part) (quoting Univ. of Cal. Regents v. Bakke , 438 U.S. 265, 303 (1978)), which continues to affect the daily lives of the disabled. Such considerations should not be overlooked.

WILLIAMS, Circuit Judge, dissenting:

By enacting the Americans with Disabilities Act (ADA) and the Rehabilitation Act, Congress has, in my opinion, attempted to expand the scope of substantive constitutional rights under the Fourteenth Amendment by subjecting state action that incidentally burdens the disabled to a higher level of judicial scrutiny than what the Supreme Court held to be required by the Constitution in City of Cleburne v. Cleburne Living Ctr. Inc., 473 U.S. 432, 446 (1985) (holding that state action affecting the disabled is constitutional if "rationally related to a legitimate government purpose"). In light of the Supreme

_____

**2** For instance, we would have no problem finding that the absence of bathrooms or programs accessible to women in a state facility open to women constitutes irrational discrimination. We would come to this conclusion not because distinctions based on gender are subject to heightened equal protection scrutiny, but because it is simply unreasonable to ignore the needs of this group, whether by "oversight" or design, when such needs can be reasonably accommodated.

20

Court's landmark decision in City of Boerne v. Flores, 117 S. Ct. 2157, 2164 (1997) (reaffirming that Congress cannot expand the substantive scope of the Fourteenth Amendment), and this Court's recent decision in Brown v. North Carolina Div. of Motor Vehicles, 166 F.3d 698, 705 (4th Cir. 1999) (striking down a regulation promulgated under the ADA in light of Boerne and Cleburne), I am constrained to conclude that Congress exceeded its power under Section 5 of the Fourteenth Amendment in enacting the ADA and the Rehabilitation Act. Because Congress has failed validly to abrogate the State of Maryland's Eleventh Amendment immunity, and the State of Maryland has not waived its Eleventh Amendment immunity by accepting federal funds, I respectfully dissent.[1]

## I.

It is well established that immunity under the Eleventh Amendment affects our subject matter jurisdiction. See Brown v. North Carolina

---

[1] In enacting the ADA, Congress announced its intent "to invoke the sweep of congressional authority, including the power to enforce the [F]ourteenth [A]mendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C.A. § 12101(b)(4) (West 1995). Because of the posture of this case, however, I need not address whether Congress has the authority to apply the ADA to state prisons under the Commerce Clause. In their suit, Plaintiffs sought monetary damages and injunctive relief. It is undisputed, however, that Plaintiffs sued Defendants in their official capacities only. As a result, only the State of Maryland is potentially liable for monetary damages. As noted above, Congress cannot abrogate the State of Maryland's Eleventh Amendment immunity when enacting legislation pursuant to the Commerce Clause. See Seminole Tribe of Florida v. Florida, 517 U.S. 44, 59-73 (1996). In addition, none of the Plaintiffs, most of whom are no longer incarcerated by the State of Maryland, are currently housed at the Roxbury Correctional Institution (RCI) in Hagerstown, Maryland, the institution to which all of Plaintiffs' claims were directed. As a result, Plaintiffs' claims for injunctive relief are moot. See Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) (holding that prisoner's transfer to another facility mooted his claims for injunctive relief); Taylor v. Rogers, 781 F.2d 1047, 1048 n.1 (4th Cir. 1986) (holding that prisoner's transfer mooted a request for declaratory and injunctive relief).

21

Div. of Motor Vehicles, 166 F.3d 698, 701 (4th Cir. 1999). Thus, when raised by a State, as it was here by the State of Maryland, this Court must first address whether Eleventh Amendment immunity is applicable.[2] See Wisconsin Dep't of Corrections v. Schacht, 118 S. Ct. 2047, 2052 (1998) (holding that a court can ignore Eleventh Amendment immunity only if a state fails to raise the question). For the reasons that follow, I conclude that this suit should have been dismissed for lack of subject matter jurisdiction. See Steel Co. v. Citizens for a Better Environment, 118 S. Ct. 1003, 1012 (1998) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." (internal quotation marks omitted)).

The Eleventh Amendment provides as follows:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. The Eleventh Amendment not only prohibits suits brought against States in federal court by citizens of other States, but also prohibits suits, such as the one here, brought against a State in federal court by its own citizens. See Hans v. Louisiana, 134 U.S. 1, 15-16 (1890). Thus, whether this Court has subject matter jurisdiction depends on whether the State of Maryland's Eleventh Amendment immunity has been either abrogated or waived.

_____

[2] The majority erroneously states that the State of Maryland has conceded that "[t]he defense of sovereign immunity is not available." Ante at 17 (citing Appellees' S. Br. at 37). Although the State of Maryland has conceded that "[t]he defense of qualified immunity is not available," (Appellees' S. Br. at 37), the State of Maryland specifically argues that if "neither the ADA nor the Rehabilitation Act can constitutionally be extended to state prisons as an exercise of Congress' enforcement power under § 5 of the Fourteenth Amendment, . . . then the Inmates' claims in federal court are barred in their entirety by the Eleventh Amendment," (Appellees' S. Br. at 37).

22

A.

In <u>Seminole Tribe v. Florida</u>, 517 U.S. 44 (1996), the Supreme Court recently considered the issue of when Congress can properly abrogate a State's Eleventh Amendment immunity. In <u>Seminole</u>, the Supreme Court specifically held that Congress had no authority to abrogate a State's sovereign immunity under the Eleventh Amendment when it enacted legislation pursuant to the Commerce Clause. <u>See id.</u> at 59-73. In contrast, Congress may abrogate a State's sovereign immunity when it enacts valid legislation pursuant to Section 5 of the Fourteenth Amendment.**3**<u>See Fitzpatrick v. Bitzer</u>, 427 U.S. 445, 456 (1976) ("[T]he Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment." (citation omitted)). Thus, whether Congress had the authority to abrogate the State of Maryland's Eleventh Amendment immunity turns on whether Congress had the authority under Section 5 of the Fourteenth Amendment to enact the ADA and the Rehabilitation Act. <u>See Atascadero State Hosp. v. Scanlon</u>, 473 U.S. 234, 238 (1985) (holding that the courts must ensure that Congress was "acting pursuant to § 5 of the Fourteenth Amendment").

The Fourteenth Amendment provides, in pertinent part, as follows:

> Section 1. . . . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person

---

**3** In addition, Congress must express its intent to abrogate the States' Eleventh Amendment immunity by providing "a clear legislative statement," <u>i.e.</u>, by "making its intention unmistakably clear in the language of the statute." <u>Seminole Tribe v. Florida</u> , 517 U.S. 44, 54 (1996) (citing <u>Blatchford v. Native Village of Noatak & Circle Village</u>, 501 U.S. 775, 785 (1991), and <u>Dellmuth v. Muth</u>, 491 U.S. 223, 224-25 (1989)). Both parties agree that the ADA, <u>see</u> 42 U.S.C.A. § 12202 (West 1995) ("A State shall not be immune under the [E]leventh[A]mendment . . . ."), and the Rehabilitation Act, <u>see</u> 42 U.S.C.A.§ 2000d-7(a)(1) (West 1994) ("A State shall not be immune under the Eleventh Amendment . . . ."), include clear statements of Congress's intent to abrogate the States' Eleventh Amendment immunity.

of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

. . . .

Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

U.S. Const. amend. XIV, §§ 1, 5. Section 5 "is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment." Katzenbach v. Morgan, 384 U.S. 641, 651 (1966). In fact, "when properly exercising its power under § 5, Congress is not limited by the same Tenth Amendment constraints that circumscribe the exercise of its Commerce Clause powers." EEOC v. Wyoming, 460 U.S. 226, 243 n.18 (1983) (emphasis added) (citing City of Rome v. United States, 446 U.S. 156, 179 (1980)). Congress's power to enact legislation under the Fourteenth Amendment is not unlimited, however. See, e.g., City of Boerne v. Flores, 117 S. Ct. 2157, 2171-72 (1997) (holding that the Religious Freedom Restoration Act is "a considerable congressional intrusion into the States' traditional prerogatives," and that Congress exceeded its power under the Fourteenth Amendment in enacting the statute); Gregory v. Ashcroft, 501 U.S. 452, 469 (1991) (stating that "the Fourteenth Amendment does not override all principles of federalism"); Oregon v. Mitchell, 400 U.S. 112, 128 (1970) (noting that "[a]s broad as the congressional enforcement power is, it is not unlimited"). For instance, Congress's power "extends only to enforcing the provisions of the Fourteenth Amendment." Boerne, 117 S. Ct. at 2164 (emphasis added) (internal quotation marks and alteration omitted). Of perhaps equal importance, Congress does not possess "the power to determine what constitutes a constitutional violation." Id. "In other words, Congress has the power to remedy violations of constitutional rights, not [the power] to define the substance of those rights." Brown, 166 F.3d at 705.

The standard for determining whether an exercise of Congress's Section 5 power is appropriate was set forth in Boerne: The injury to be prevented or remedied must be a "constitutional violation[ ],"

24

Boerne, 117 S. Ct. at 2163, and the means employed must be congruent and proportional to any such violation, see id. at 2164. Although Congress has the power to remedy violations of constitutional rights, it bears repeating that the Supreme Court in Boerne specifically rejected the notion that Congress can expand or define the substantive scope of constitutional rights using its Section 5 powers:

> Congress does not enforce a constitutional right by changing what the right is. It has been given the power "to enforce," not the power to determine what constitutes a constitutional violation. Were it not so, what Congress would be enforcing would no longer be, in any meaningful sense, the"provisions of [the Fourteenth Amendment]."

Boerne, 117 S. Ct. at 2164 (alteration in original).

In Boerne, the Supreme Court decided that, in enacting the Religious Freedom Restoration Act (RFRA), Congress had impermissibly attempted to expand the scope of substantive constitutional rights under the Fourteenth Amendment by subjecting generally applicable state laws that had the effect of burdening religion to a higher level of judicial scrutiny than that required by the Supreme Court in Employment Division v. Smith, 494 U.S. 872, 887-88 (1990). In sum, the Supreme Court held that Congress could not create a substantive constitutional right to "strict scrutiny" for state action to which the Supreme Court had already determined that a lower standard of review should apply. See Boerne, 117 S. Ct. at 2170. In so holding, the Supreme Court made the following observation about RFRA:

> The stringent test RFRA demands of state laws reflects a lack of proportionality or congruence between the means adopted and the legitimate end to be achieved. If an objector can show a substantial burden on his free exercise, the State must demonstrate a compelling governmental interest and show that the law is the least restrictive means of furthering its interest. . . . Laws valid under Smith would fall under RFRA without regard to whether they had the object of stifling or punishing free exercise. We make these observations . . . to illustrate the substantive alteration of [Smith's] holding attempted by RFRA. Even assuming RFRA would

25

be interpreted in effect to mandate some lesser test, say one equivalent to intermediate scrutiny, the statute nevertheless would require searching judicial scrutiny of state law with the attendant likelihood of invalidation. This is a considerable congressional intrusion into the States' traditional prerogatives and general authority to regulate for the health and welfare of their citizens.

Id. at 2171.

In City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432 (1985), the Supreme Court expressly rejected an attempt to make the mentally disabled a suspect, or quasi-suspect, class for Equal Protection purposes:

> [W]e conclude for several reasons that the Court of Appeals erred in holding mental retardation a quasi-suspect classification calling for a more exacting standard of judicial review than is normally accorded economic and social legislation.

Cleburne, 473 U.S. at 442. The Supreme Court determined that state action placing incidental burdens on the mentally disabled would be subject to rational basis scrutiny. See id. at 446 (holding that state action affecting the mentally disabled is constitutional if "rationally related to a legitimate governmental purpose"); see also Doe v. University of Md. Medical Sys. Corp., 50 F.3d 1261, 1267 (4th Cir. 1995) (extending rational basis scrutiny to all disabilities). As the First Circuit recently noted:

> Congress' section five enforcement power, as it pertains to the Equal Protection Clause in cases not involving suspect or quasi-suspect classes or fundamental interests, is limited to the elimination of arbitrariness or the effects of arbitrary government action, and does not permit Congress to prohibit or otherwise target reasonable state decisions or practices.

Mills v. Maine, 118 F.3d 37, 47 (1st Cir. 1997); see also Brown, 166 F.3d at 706-07 (noting that arbitrary and irrational discrimination violates the Equal Protection Clause under rational basis scrutiny).

26

A careful review of the Supreme Court's decisions in Boerne and Cleburne, reveals an amazing similarity between the ADA and RFRA. As Judge Smith recently noted:

> Both RFRA and the ADA purport to establish greater rights for individuals against the states by increasing the measure of judicial scrutiny for conflicting state actions to a level higher than the Supreme Court has found appropriate under the Fourteenth Amendment. . . . [T]he ADA increases the judicial scrutiny level applicable for disabled persons by requiring a closer nexus between the governmental purpose and the governmental means than presently exists under rational basis scrutiny. The ADA mandates an affirmative justification for a state action that has the effect of incidentally burdening these non-suspect classes of persons; a state's actions are no longer presumptively valid if rationally related to the interests that they serve. Instead, the state must make "reasonable accommodations" for the disabled -- and only once the state can show that it cannot "reasonably accommodate" will the courts validate the state's chosen policy.

Coolbaugh v. Louisiana, 136 F.3d 430, 440-41 (5th Cir. 1998) (Smith, J., dissenting) (internal citation omitted). A panel of this Court recently came to the same conclusion, i.e., the ADA, like RFRA, impermissibly attempts to subject state action to higher level of judicial scrutiny than the Supreme Court has found appropriate under the Fourteenth Amendment. See Brown, 166 F.3d at 708.

Although the panel in Brown considered the validity of a regulation promulgated under the ADA, rather than the ADA itself, I believe that the panel's reasoning controls the issue before us today. In holding that the regulation at issue did not lie within the scope of Congress's enforcement power under the Fourteenth Amendment, the panel in Brown specifically held that the level of judicial scrutiny required by the ADA was incompatible with the more lenient rational basis test established in Cleburne. See id. In fact, as this Court noted, the ADA was simply not intended to remedy violations of the standard established in Cleburne. See id. Rather, the ADA was intended to effect a "`substantive alteration of [Cleburne's] holding.'" Id. (quoting

27

Boerne, 117 S. Ct. at 2171). As a result, State actions that are rationally based and perfectly constitutional under Cleburne are invalid under the ADA. In that crucial respect, the ADA is nearly indistinguishable from RFRA, i.e., the ADA is definitional rather than remedial. Indeed, as Judge Smith observed, by changing but a few words in Boerne, the Supreme Court could well have been speaking about the ADA:

> The stringent test [the ADA] demands of state laws reflects a lack of proportionality or congruence between the means adopted and the legitimate end to be achieved. If an objector can show a substantial burden [of his rights under the ADA], the State must [show that it cannot reasonably accommodate him]. . . . Laws valid under [Cleburne] would fall under [the ADA] without regard to whether they [were rationally related to a legitimate governmental purpose]. We make these observations . . . to illustrate the substantive alteration of [Cleburne's] holding attempted by [the ADA]. Even assuming [the ADA] would be interpreted in effect to mandate some lesser test, say one equivalent to intermediate scrutiny, the statute nevertheless would require searching judicial scrutiny of state law with the attendant likelihood of invalidation. This is a considerable congressional intrusion into the States' traditional prerogatives and general authority to regulate for the health and welfare of their citizens.

Boerne, 117 S. Ct. at 2171.

Prior to this Court's decision in Brown, five Circuits published opinions upholding the ADA as a valid exercise of Congress's Section 5 powers. See Kimel v. Florida Bd. of Regents, 139 F.3d 1426, 1433 (11th Cir. 1998), cert. granted, 119 S. Ct. 901 (1999); Autio v. AFSCME, Local 3139, 140 F.3d 802, 806 (8th Cir. 1998), vacated, 140 F.3d 802, reh'g en banc, 157 F.3d 1141 (affirming district court's decision upholding the ADA by an evenly divided vote); Coolbaugh v. Louisiana, 136 F.3d 430, 432 (5th Cir.), cert. denied, 119 S. Ct. 58 (1998); Clark v. California, 123 F.3d 1267, 1270 (9th Cir. 1997), cert. denied, 118 S. Ct. 2340 (1998); and Crawford v. Indiana Dep't of Corrections, 115 F.3d 481, 487 (7th Cir. 1997). Despite that fact, it is worth noting that a number of appellate and district court judges

28

have come to the opposite conclusion. See Autio , 157 F.3d at 1141 (Bowman, C.J., & Wollman, Beam, Loken, Hansen, & Morris Sheppard Arnold, JJ.) (concluding that Congress exceeded its power under Section 5 of the Fourteenth Amendment in enacting the ADA); Kimel, 139 F.3d at 1444 (Cox, J., dissenting) (noting that the disabled enjoy no special rights under the Equal Protection Clause); Coolbaugh, 136 F.3d at 439 (Smith, J., dissenting) (noting that in the wake of Boerne, Congress could not, consistent with the Fourteenth Amendment, increase the level of scrutiny for states' actions that incidently burden disabled persons); Kilcullen v. New York State Dep't of Trans., 33 F. Supp.2d 133 (N.D.N.Y. 1999) (same); Hedgepeth v. Tennessee, 33 F. Supp.2d 668, 675 (W.D. Tenn. 1998) (same); Garrett v. Board of Trustees of University of Ala. in Birmingham, 989 F. Supp. 1409 (N.D. Ala. 1998) (same); Brown v. North Carolina Div. of Motor Vehicles, 987 F. Supp. 451 (E.D.N.C. 1997) (same); Nihiser v. Ohio E.P.A., 979 F. Supp. 1168, 1170-76 (S.D. Ohio 1997) (same). Like the aforementioned judges, I conclude -- and would so conclude even without this Court's recent decision in Brown , which I believe to be controlling here -- that Congress exceeded its power under Section 5 of the Fourteenth Amendment by enacting the ADA.

Congress does not possess the power under Section 5 of the Fourteenth Amendment to supersede a Supreme Court decision construing the substantive rights embodied by the Constitution. See United States v. Dickerson, 166 F.3d 667, 687 (4th Cir. 1999). In Cleburne, the Supreme Court held that the disabled are not a class entitled to increased Fourteenth Amendment protection. In light of the Supreme Court's decision in Cleburne, Congress does not have the power to declare otherwise in the ADA. See Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803). Following this Court's decision in Brown, which faithfully applied the dictates of Boerne and Cleburne, I am constrained to conclude that Congress exceeded its authority under Section 5 of the Fourteenth Amendment in attempting to abrogate Maryland's sovereign immunity with the ADA.

B.

In Atascadero State Hosp. v. Scanlon, 473 U.S. 234 (1985), the Supreme Court considered whether a State waives its Eleventh Amendment immunity by accepting federal funds under a federal pro-

29

gram enacted pursuant to the Spending Clause. In Atascadero, the Supreme Court specifically held that "the mere receipt of federal funds cannot establish that a State has consented to suit in federal court." Id. at 246-47. Rather, the statute in question must expressly "condition participation in the program funded under the Act on a State's consent to waive its constitutional immunity." Id. at 247.

In response to the Supreme Court's decision in Atascadero, Congress amended the Rehabilitation Act as follows:

> (1) A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 . . . or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

> (2) In a suit against a State for a violation of a statute referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State.

42 U.S.C.A. § 2000d-7(a) (West 1994). Without question, Congress, by enacting § 2000d-7(a), has expressed its intent to abrogate the States' Eleventh Amendment immunity. See Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 72 (1992) (noting that Congress, by enacting § 2000d-7, expressed its intent to "abrogate" the States' Eleventh Amendment immunity under the Rehabilitation Act). I question, however, whether the language of § 2000d-7 sufficiently "conditions" a State's receipt of federal funds under the Rehabilitation Act on that State's "consent" to waive its Eleventh Amendment immunity.

As the Supreme Court recently noted, the doctrines of abrogation and waiver are "completely unrelated." Seminole Tribe, 517 U.S. at 63. With respect to the Eleventh Amendment, abrogation deals with Congress's power under Section 5 of the Fourteenth Amendment to subject unconsenting States to federal court jurisdiction. See Atascadero, 473 U.S. at 242-46. In contrast, waiver deals with, among

30

other things, Congress's power under the Spending Clause to condition the receipt of federal funds on a State's consent to federal jurisdiction. See id. at 246-47. Thus, while statutory language may be sufficient to satisfy the demands of abrogation, it may nonetheless fail to satisfy the demands of waiver. Here, the language in question simply placed the State of Maryland on notice that it could be sued in federal court if the Rehabilitation Act was a valid exercise of Congress's power under Section 5 of the Fourteenth Amendment. Indeed, the statute did not use the type of words or phrases, e.g. "if," "provided that," "when," "after," "as soon as," and "subject to," that would indicate that the receipt of funds had been made conditional. Because § 2000d-7(a) did not, as the Supreme Court requires, "expressly condition" the State of Maryland's receipt of federal funds under the Rehabilitation Act on its consent to waive its constitutional immunity, there is no indication that the State of Maryland knowingly and voluntarily waived its Eleventh Amendment immunity.

II.

Because the State of Maryland's Eleventh Amendment immunity was neither abrogated nor waived, this case should have been dismissed for lack of subject matter jurisdiction. Accordingly, I respectfully dissent.

31