**PROJECT LIFE, INC., et al.**

v.

**Parris GLENDENING, et al.**

**Civil Action No. WMN–98–2163.**

United States District Court,
D. Maryland.

May 2, 2001.

James B. Moorhead, Codeon Corporation, Columbia, MD, Andrew D. Levy, Brown Goldstein and Levy LLP, Baltimore, MD, Reid H. Weingarten, Andrea C. Evans, Andrew J. Sloniewsky, Shannen W. Coffin, Linda S. Stein, Betty Jo Christian, Steptoe & Johnson, LLP, Washington, DC, Martin D. Schneiderman, Law Office, Washington, DC, for plaintiffs.

Margaret Witherup Tindal, Gordon Feinblatt Rothman, Hoffberger and Hollander LLC, Baltimore, MD, Edward R.K.

Hargadon, Attorney General's Office, Md. Dept of Transportation, BWI Airport, MD, Kathleen A. Morse, Randolph Stuart Sergent, Wendy A Kronmiller, Stephanie Judith Lane-Weber, David P. Kennedy, Office of the Attorney General, Baltimore, MD, Deborah M. Levine, The Attorney General's Office, Assistant Attorney General, Baltimore, MD, Kimberly Smith Ward, Law Office, Baltimore, MD, for defendants.

## MEMORANDUM

NICKERSON, District Judge.

Briefly stated, this case arises out of the efforts of Plaintiff Project Life, Inc., a non-profit organization, to find a permanent berth for the U.S.S. Sanctuary, a decommissioned United States Navy hospital ship. Plaintiff[1] hopes to use the ship as a residential education facility for women recovering from substance abuse. Plaintiff has argued throughout this litigation that Defendants, various agencies and officials of the State of Maryland, have denied it a permanent berth because of pressure brought against them by other tenants of the Maryland Port Authority [MPA] and members of the communities near the potential berthing sites. Plaintiff brought claims under Title II of the Americans with Disabilities Act [ADA], and the Fair Housing Act [FHA].[2]

This Court has had several opportunities to address the merits of Plaintiff's claims. Shortly after the case was instituted, Defendants filed a motion to dismiss, or in the alternative, for summary judgment, arguing that the operation of a residential facility was fundamentally inconsistent with the operations of a busy commercial port. The Court denied the motion on November 30, 1998, noting that, until the filing of this litigation, Defendants never took the position that operating the Sanctuary in the Port was inconsistent with the Port's mission; it was simply a question of where best to locate the ship. The Court concluded, based upon the record then before it, that it remained a disputed question of fact as to whether leasing a berth to a residential facility would involve more than a reasonable accommodation on the part of Defendants, and that a jury could reasonably conclude that it was the MPA's deference to co-tenant and community prejudices against recovering substance abusers that had delayed the leasing of a berth to the Sanctuary. November 30, 1998 Memorandum at 4–5.

On January 21, 1999, Defendants filed a second motion to dismiss, this time arguing that this action was premature in that "the MPA has not as yet decided whether to approve or reject Project Life's proposal for berthing the Sanctuary at an MPA pier." Motion at 2. Defendants represented that there was a proposal before the Port Land Use Development Zone Advisory Council considering the Sanctuary's proposed long-term use of Pier Six at North Locust Point and declared that "it is entirely possible that the MPA will grant plaintiffs' request for a long-term lease." *Id.* at 3. The Court denied Defendants' motion, concluding that the lengthy delay in granting a long-term lease, if done for discriminatory reasons, would itself give

---

1. The complaint originally also named as plaintiffs three women who would have been potential participants in Project Life's rehabilitation program. One of those individuals was withdrawn as a plaintiff prior to trial and the jury found against the other two women on the only claims that were applicable to them.

2. Plaintiff originally brought claims pursuant to the federal and state fair housing acts. Recognizing that the federal and state statutes are interpreted in para materia, and that any relief afforded under the state statute would be duplicative of relief granted under the federal statute, Plaintiff withdrew its state fair housing act claim on March 12, 2001.

rise to compensable injury even if Defendants were to enter a lease prior to trial.

The anticipated lease of Pier Six was not agreed upon, however, and extensive discovery continued. Upon completion of that discovery, Defendants moved yet again for summary judgment. By this point, the possible locations for the Sanctuary had been narrowed to three: Pier Five at Childs Street; Pier Six, North Locust Point, where the ship is currently berthed; and Pier Eight, North Locust Point. On October 6, 2000, the Court denied Defendants' motion for summary judgment but did hold, for reasons related to the business operations of surrounding tenants, that the Sanctuary could not be reasonably accommodated at the Childs Street pier. As to the North Locust Point piers, the Court held that there was a genuine dispute of fact as to whether Defendants' opposition to locating the Sanctuary at that location was based on legitimate concerns about the incompatability of the Sanctuary's mission with that of the Port, or on unlawful acquiescence to community pressures related to the nature of the population to be served by the Sanctuary's programs.

Trial was scheduled for October 30, 2000. The commencement of the trial was briefly delayed, however, when the parties represented to the Court that they were very close to a settlement that would have resulted in a lease agreement that would allow the Sanctuary to become operational. Again, however, the anticipated settlement fell through, and trial commenced before a jury selected on October 31, 2000. Throughout the course of the trial, the parties were in agreement that only Plaintiffs' ADA damage claims would be submitted to the jury. Based on the Defendants' assertion of the defense of sovereign immunity as to the fair housing act claims, it was agreed that those claims would be tried to the Court.

After 15 days of trial, the jury returned a verdict on November 30, 2000. The jury found Defendants liable under the ADA to Plaintiff Project Life, but found against the individual plaintiffs on those same claims.[3] The trial then resumed with the presentation of evidence as to Plaintiff Project Life's damages. On December 5, 2000, the jury returned with an award for Project Life of $12.00.

On December 11, 2000, the Court held a hearing to consider Plaintiff's request for injunctive relief. At the end of the hearing, for reasons stated on the record, the Court concluded that an injunction requiring Defendants to enter into a five year lease with Project Life should issue. The Court also held that the lease provisions, including the determination of the pier where the Sanctuary would be located, the amount of rent, and who would bear the costs of improvements, should be negotiated in good faith as the MPA would with any other tenant. The Court gave the parties 30 days to negotiate the agreement, but allowed that the Court would resolve any outstanding issues if the parties were unable to finalize an agreement.

Efforts to agree upon the terms of the lease were largely unsuccessful and the parties submitted additional briefing on the disputed terms and a second hearing was scheduled and held on February 21, 2001. On the same date as this hearing, the United States Supreme Court issued its opinion in *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). In *Garrett*, the Court held that Congress's abrogation of the States' Eleventh Amendment immunity was invalid for suits by private citizens against a State in

---

**3.** Prior to trial, the Court had bifurcated issues of liability and damages.

federal court for damages under Title I of the ADA. Because neither the parties nor the Court had had the opportunity to review the potential impact of *Garrett* on the case at bar, the Court reserved on the pending motion and allowed further briefing on issues related to *Garrett.*

On March 5, 2001, Defendants filed a pleading entitled "Defendants' Assertion of Eleventh Amendment Immunity and Post Trial Motion for Judgment," Paper No. 188. In that motion, Defendants argued that, although *Garrett* was decided under Title I of the ADA, it should be applied with equal force to invalidate the abrogation of Eleventh Amendment immunity in Title II of the ADA as well. Without that abrogation of immunity, Defendants argued, Plaintiff had no viable claim for damages,[4] and thus, had no right to a jury trial. Because there was no right to a jury trial, Defendants contend that the Court would be free to ignore the jury's verdict and any factual findings implicit in that verdict. Defendants then requested that the Court consider the evidence *de novo*, find that Plaintiff did not prove its ADA claim by a preponderance of evidence, and enter judgment in favor of Defendants as to all claims.

Plaintiff challenges this argument at each step. Plaintiff responds that: 1) *Gar-*

*rett* is inapplicable to claims under Title II of the ADA, 2) regardless of whether Plaintiff had a viable Title II claim and, therefore, the right to a jury trial, Defendants consented to a jury trial and thus, the jury's verdict is binding, and 3) were the Court to ignore the jury's verdict and make it own conclusions based upon the evidence, the Court's conclusions should be the same as those of the jury.

■ To resolve the issue of Plaintiff's entitlement to an injunction, the Court need only consider the last argument, for the Court concludes that if it were to make its own factual determination, it too would find that Plaintiff was discriminated against on the basis of the disability of the population it intends to serve.[5] The evidence presented at trial established essentially what Plaintiff represented it would throughout this litigation. It is readily apparent that some officials at the MPA recognized the value of the program that Project Life sought to offer and the need for this type of treatment option for women recovering from addiction. These individuals worked diligently to find a suitable berth for the Sanctuary, and the evidence demonstrated that Pier Six at North Locust Point could be a suitable berth, if reasonable and relatively minor accommodations were made.

4. Defendants concede that, under the doctrine of *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), Plaintiff can obtain an injunction for the prospective enforcement of federal law without regard to the validity of the abrogation of sovereign immunity.

5. Although the parties have not directly addressed the issue, the Court must consider the applicability of *Garrett* to Title II of the ADA in order to determine if the jury's award of $12 should be allowed to stand. The Court notes that the Supreme Court began its opinion in *Garrett* by stating that it was not deciding whether the abrogation of sovereign immunity for claims under Title II was valid. 121 S.Ct. at 960 n. 1. Title II, the Court noted,

"has somewhat different remedial provisions from Title I." *Id.* The Court also noted the split among the circuits as to that issue. *Id.*

The Fourth Circuit has addressed this issue on a single occasion, in *Amos v. Maryland Dep't of Pub. Safety & Correctional Servs.*, 178 F.3d 212 (4th Cir.1999) and found the abrogation of sovereign immunity in Title II was valid. The *Amos* decision was subsequently vacated after the parties reached a settlement while awaiting the rehearing en banc. 205 F.3d 687 (4th Cir.2000). Nonetheless, this Court finds the reasoning of the panel decision in *Amos* compelling and, accordingly, finds that the jury's award on Plaintiff's Title II claims should stand.

But the evidence presented at trial also demonstrated that, while some officials of the MPA were working diligently to find the Sanctuary a home, other forces were at work to assure that the Sanctuary would not find a permanent home, at least not in North Locust Point. Those forces were exerted at some level of the State's decision making process above the MPA by elected officials from the nearby community. While the State offered a series of pretextual reasons for the failure to enter into a lease with Project Life, it is clear from the evidence that the real reason, or at least, one of the most significant reasons, for the State's refusal to enter into the lease was the desire of those elected officials that the Sanctuary's programs not be located in "their backyard," and the Defendants' illegal acquiescence to that desire.

Having found previously that Plaintiff is entitled to an injunction, and having now concluded that nothing about the *Garrett* decision alters that conclusion, the Court must now address those provisions of the lease agreement about which the parties were unable to agree.

*Which Pier?*

 With the Court's prior elimination of the Childs Street pier as a potential location for the Sanctuary, only two options remain: Pier Six and Pier Eight at North Locust Point. Throughout this litigation and particularly at trial, the vast majority of the discussion centered around Pier Six. Pier Eight, the Court would note, is not actually a pier, it is little more than pilings standing in the water where a pier once stood. Defendants take the position that while Project Life would be allowed to initially open its program at Pier Six, it must immediately commence to build the requisite catwalks and moorings at Pier Eight so that the Sanctuary could be moved to that location within two years. Defendants contend that Plaintiff must

bear all of the cost of rebuilding Pier Eight, which they estimate at over $700,000. Plaintiff estimates the cost at between $1 million and $3 million. The Defendants' preference for Pier Eight over Pier Six relates to the relative distance from marine terminal operations.

The Court concludes that the lease should provide a berth at Pier Six. Pier Six has remained unused for at least 15 years and there is no indication that there are plans to use the pier in the near future. The Court finds Defendants' representations concerning the amount of marine cargo activity in the area surrounding Pier 6 to be somewhat exaggerated. Various representatives of Plaintiff testified that, much of the time for the last several years, there is no activity on the area surrounding the pier. While Defendants submitted a video tape showing this area as a beehive of activity, with forklifts and trucks loading and unloading lumber, the Court believes, based upon the evidence at trial, that this level of activity is something of an anomaly. On the few days each year that there is that volume of commercial traffic in the area, the Court is confident that a little advanced planning and coordination will allow the Sanctuary to co-exist with its neighbors.

The alternative, to force Project Life to expend funds to rebuild Pier Eight at the same time that it is beginning its programs on Pier Six would be cost prohibitive. It would also represent an economic waste. As Defendants have argued repeatedly, the infrastructure and adaptations that Project Life would make to a pier to render it usable for its purposes would not be of any benefit to other future users of the pier. Assuming that the catwalk and mooring system was only $700,000, the figure advanced by Defendant, that would still be $700,000 expended that would add

no permanent benefit to the MPA's facilities.[6]

### Rental Rate

■ In looking for a comparable rental rate, Plaintiff contends that it should pay $1,667 per month, the amount that a Navy contractor initially paid to layberth two Navy vessels at Clinton Street. Defendants initial position on the rental rate was that Plaintiff should pay the going tariff rate of $780 per day, or $284,700 per year, but they now propose that $7,604 per month, the lowest rate currently paid for any Navy lay ship, is an equitable rate.

The Court would agree that the Navy layberths present a reasonably comparable leasing transaction to look to in establishing an equitable rental rate. The Court concludes, however, that Plaintiff is not entitled to the $1,667 per month rate because, when the Navy contractor was paying at that rate, it was also in the process of making over $1 million dollars in renovations to the pier at its own expense. Plaintiff, it is true, will be making some renovations, but not to the degree that was necessary to accommodate the navy lay berths. The Court determines that an equitable rental fee would be $2,500 per month. In arriving at this figure, the Court is cognizant that, for the last 15 years, the MPA has derived little income from Pier 6, and an alternative tenant for the pier is unlikely to be found in the near future.[7]

### Escrow Amount for Removal of Ship

■ Concerned about what would happen to the Sanctuary should Project Life become financially unable to continue to operate its programs, Defendants have asked that an escrow account be established to fund the removal and/or disposal of the vessel. Initially, Defendants sought $25,000 in escrow, believing this to be an amount sufficient to tow the vessel to Norfolk, Virginia, the place where Project Life's predecessor took possession of the ship. Defendants now contend that Plaintiff should be required to post a $5 million bond, to cover what it contends to be the estimated cost of scrapping the ship.[8] Plaintiff maintains that the amount in escrow should be limited to one month's rent, the standard escrow for MPA leases.

Certainly, the future of the Sanctuary is fraught with uncertainty. Because most of the evidence now presented relative to the ultimate disposition of the Sanctuary emerged after the trial, most of that evidence is undeveloped and untested. It is not clear whether the Navy would retake possession of the ship. It is not clear if other uses for the ship will arise should Project Life's programs become economically unfeasible. It is unclear, should the Sanctuary ever need to be scrapped, that it will cost $5 million dollars as Defendants contend, or if the salvage of equipment and material from the ship would completely offset the costs of scrapping, as Plaintiff argues.

---

**6.** There are also costs involved in rendering Pier Six suitable and safe for Project Life's programs, including some repairs to the decking and the installation of utility and water lines. The costs for these renovations at Pier Six, however, are significantly less. Because they will be equally non-beneficial to other users, Plaintiff will be expected to bear the costs of those renovations.

**7.** The parties have agreed that the current rate of $1 per month will remain in effect until Project Life admits its first students onboard, or one year from the Effective Date of the lease, whichever is sooner.

**8.** Defendants maintain that they just recently learned that, contrary to Plaintiff's representations throughout this litigation, the Navy will not retake possession of the ship should it no longer be used for humanitarian purposes. Thus, if Project Life's programs fail, the MPA would be forced to incur the costs of scrapping the Sanctuary.

The bottom line, in the Court's view, is that Defendants have not sufficiently established the need for the extraordinary escrow that they are now requesting. The Sanctuary has been in MPA facilities for more than 10 years and no bond has been posted, nor requested. Defendants have offered no reason why Plaintiff's triumph in this litigation and ability to now become operational creates a greater risk to Defendants that needs to be secured by the posting of a $5 million bond. Furthermore, Defendants have identified no other tenant subject to such a provision. For these reasons, the Court determines that a standard one month security deposit is all that will be required.

*Access Gate*

Plaintiff requests that it be able to use the main security gate in accessing Pier Six. Defendants suggest that Project Life employees and contractors enter and exit via the Hull Street gate, a gate that is more remote and isolated from the bulk of rail, truck and forklift activity. The Court finds Defendants' suggestion imminently reasonable, and notes that Plaintiff's own expert first suggested the use of the Hull Street gate as a means of minimizing the risk of injury.

*Relocation of Sanctuary if Pier Six Untenable*

■ The lease as proposed by Defendants contains a standard provision that, should the pier become untenable due to fire, hurricane or other natural disaster, that both parties would be relieved of their obligations under the lease. Plaintiff desires an additional provision in the lease that would require the MPA to relocate the Sanctuary to another pier for the remainder of the lease term, should Pier Six be deemed untenable.

There are two problems with Plaintiff's suggested revision of the lease. First, Plaintiff has pointed to no other lease that provides a similar guarantee. Second, and more significant, is the fact that there is no other pier that has been identified that would be suitable to Plaintiff's mission. After years of searching, the only lay-berths that have been identified by the parties that are capable of handling the Sanctuary are: Pier 5 Childs Street, which the Court has determined to be unsuitable; Pier 1 Clinton Street, which Plaintiff has rejected; Pier 8 North Locust Point, that would require renovations too extensive to be practical; and Pier 6 North Locust Point. If Pier 6 were to become unusable, there is no reason to believe that the MPA would then be able to find a replacement pier when no such pier has emerged after years of diligent searching.[9]

*Continuing Jurisdiction*

■ The standard MPA lease agreement provides that it is subject to Maryland law and enforceable in Maryland state courts. Plaintiff would alter that standard provision to give this Court continuing jurisdiction over the terms of the lease. The Court agrees with Defendants that, once the lease agreement is executed, it should be treated as any other lease and there is no need for further involvement of this Court.

That appears to be the last remaining lease provision that is in dispute. With this guidance from the Court, the parties should be able to finalize the lease agreement. One additional issue remains to be resolved in this litigation, i.e., Plaintiff's FHA claim, which was tried to the Court.

■ The basic legal parameters of a Fair Housing Act claim, at least those that

9. Plaintiff appears to be concerned the Defendants will use the untenable cause as a ruse to prematurely terminate the lease. Obviously, the untenable clause must be applied in good faith and Pier Six cannot be declared untenable unless it is legitimately rendered so.

are in dispute, were set out in this Court's memorandum opinion of November 30, 1998. The factual considerations are largely the same as those relevant to Plaintiff's ADA claim, discussed *supra*. In short, the Court finds that Defendants unlawfully denied Plaintiff services and facilities, specifically, a berth, in connection with what would become a dwelling, the Sanctuary. This denial was discriminatory in that Defendants acquiesced to community pressure to keep the Sanctuary out of the community because of discriminatory animus toward the disabled population that Project Life would serve. That acquiescence was a violation of the FHA. *See Innovative Health Systems v. City of White Plains,* 117 F.3d 37, 49 (2nd Cir. 1997) ("a decision made in the context of strong, discriminatory opposition becomes tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter").

■ While Eleventh Amendment immunity precludes the award of damages against these Defendants, the Court has the authority, under the doctrine of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), to issue an injunction to compel State officials to comply with Federal law. In this instance, the injunctive remedy under the FHA is the same as that called for under the ADA, an injunction to compel Defendants to enter into a long term lease with Project Life. In issuing this injunction, the Court concludes that Project Life will suffer serious injury if it is unable to enter into a long-term lease for the berthing of the Sanctuary that will enable it to operate its programs to assist women who are handicapped because of their drug and alcohol addiction; the hardship to Defendants of such an injunction is outweighed by the harm to Plaintiffs if the injunction does not issue; and the benefits to the State of Maryland from the opening of the program aboard the Sanctuary

weigh in favor of the issuance of an injunction.

A separate order consistent with this memorandum will issue.

### *ORDER*

In accordance with the foregoing Memorandum and for the reasons stated therein, IT IS this day of May, 2001, by the United States District Court for the District of Maryland, ORDERED:

1. That Defendant's renewed motion for judgment as a matter of law, Paper No. 178, is DENIED;

2. That Defendant's motion for post-trial judgment, Paper No. 188, is DENIED;

3. That Plaintiff's motion for an injunction, Paper No. 181, is GRANTED;

4. That Defendants, within 30 days of the date of this Order, shall enter into a lease with Project Life under terms consistent with the parties' previously negotiated positions, as supplemented by this Court's resolution of disputed issues as set forth in the accompanying memorandum;

5. That judgment is ENTERED in favor of Plaintiff Project Life, Inc., and against Defendants Parris Glendening, Governor of the State of Maryland; John Porcari, Secretary of Transportation; Maryland Department of Transportation; James J. White, Executive Director of the Maryland Port Administration; and Maryland Port Administration, in the amount of $12.00;

6. That judgment is ENTERED against Plaintiffs Vanessa Trudy Barlow and Barbara Nevette Williams;

7. That the claims against Defendant Port Land Use Development Zone Advisory Council shall be DISMISSED, for reasons stated on the record;

8. That any and all prior rulings made by this Court disposing of any claims against any parties are incorporated by reference herein and this order shall be deemed to be a final judgment within the meaning of Fed.R.Civ.P. 58;

9. That this action is hereby CLOSED; and

10. That the Clerk of the Court shall mail copies of the foregoing Memorandum and this Order to all counsel of record.