# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————

No. 14-40955

———————

United States Court of Appeals
Fifth Circuit

**FILED**

July 23, 2015

Lyle W. Cayce
Clerk

TRYSHATEL MCCARDELL, also known as Trysha McCardell,

Plaintiff – Appellant,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; JULIAN CASTRO, In His Official Capacity as Secretary of United States Department of Housing and Urban Development; THE GENERAL LAND OFFICE OF THE STATE OF TEXAS; GALVESTON HOUSING AUTHORITY; THE CITY OF GALVESTON; TEXAS DEPARTMENT OF HOUSING AND COMMUNITY AFFAIRS,

Defendants – Appellees

———————————

Appeal from the United States District Court
for the Southern District of Texas

———————————

Before HIGGINBOTHAM, DAVIS, and SOUTHWICK, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Hurricane Ike made landfall over Galveston Island in September 2008 and wrought widespread devastation on the region. Among the ruins were 569 public housing units comprising four sites located in impoverished areas of Galveston County. This case centers on a plan to replace those units in part by redeveloping on two of the sites destroyed by Ike. We address questions concerning the scope of standing to sue under the Fair Housing Act of 1968, whether Congress intended by that Act to abrogate States' sovereign

No. 14-40955

immunity, and whether Appellees can avail themselves of a safe harbor provision contained in the United States Housing Act of 1937, as amended by the Quality Housing and Work Responsibility Act of 1998.[1]

I.

A. Regulatory Backdrop

The provision of public housing in the United States is authorized under 42 U.S.C. § 1437 and administered by the United States Department of Housing and Urban Development ("HUD").[2] HUD carries out this duty in part by distributing funds to local public housing authorities ("PHAs") that, in turn, manage housing projects.[3] The relationship between HUD and a PHA is governed by a standard written contract called an "annual contributions contract" or "ACC."[4] Under an ACC, HUD agrees to provide funds for housing assistance payments and administrative fees and in exchange the PHA "agrees to administer the program in accordance with HUD regulations and requirements."[5] A PHA may apply to HUD for authorization to demolish or dispose of a public housing project under 42 U.S.C. § 1437p. "[I]n cases where PHAs must demolish housing due to an emergency or natural disaster," however, it "has been HUD's practice, as reflected in the [standard form] ACC," to allow demolition without prior authorization to ensure the health and safety of residents.[6] "If the PHA rebuilds less than all of the demolished structures or the project, the PHA shall submit a demolition application . . . within one year

---

[1] 42 U.S.C. § 1437 *et seq.*

[2] *See* 24 C.F.R. § 970.1 *et seq.*

[3] *Id.* at § 982.151(a)(1).

[4] *Id.*

[5] *Id.*

[6] Public Housing Program: Demolition or Disposition of Public Housing Projects, and Conversion of Public Housing to Tenant-Based Assistance, 79 Fed. Reg. 62,250, 62,254, 62,265 (October 16, 2014) (to be codified at 24 C.F.R. § 970.33), *also available at* http://www.gpo.gov/fdsys/pkg/FR-2014-10-16/pdf/2014-24068.pdf.

No. 14-40955

of such demolition to formalize and request official HUD approval for the action under [section 1437p]."[7]

## B. The Demolition

The Galveston Housing Authority ("GHA") is the PHA that manages and administers public housing in Galveston County. In the wake of the storm, the City of Galveston declared four public housing sites "unfit for human occupancy" and it ordered GHA to demolish Oleander Homes, Palm Terrace, Magnolia Homes, and Cedar Terrace.[8] Consistent with HUD's practice in like cases, GHA sent a letter to HUD announcing its intent to demolish Oleander Homes and Palm Terrace without seeking prior authorization from HUD's Special Applications Center under section 1437p.[9] Lone Star Legal Aid, a nonprofit legal organization, filed an administrative complaint with HUD opposing GHA's demolition plan on behalf of displaced public housing tenants. GHA and LSLA reached a settlement of the complaint under which GHA agreed to provide replacement housing on a one-for-one basis for all residential units destroyed by Ike and to incorporate the terms of an agreed upon replacement plan.[10]

Having satisfied LSLA's concerns, GHA moved forward and demolished all four sites, including the housing units situated at the Magnolia Homes and Cedar Terrace sites, on August 6, 2009.[11] It then submitted a formal demolition application to HUD.[12] In a letter dated April 15, 2010, HUD approved GHA's application "as outlined in [an] enclosed memorandum from [HUD's director of

---

[7] *Id.* at 62,265.

[8] R.3384-87.

[9] R.3390, 4686-87; *see* 24 C.F.R. § 970.1 *et seq.*

[10] R.3390-92.

[11] R.4608.

[12] *See supra* Note 6 and accompanying text (citing 79 Fed. Reg. 62,250, 62,265 (to be codified at 24 C.F.R. § 970.33)).

3

No. 14-40955

SAC] to the HUD Houston Program Center."[13] In the enclosed memorandum, the SAC director stated, "[b]ased upon our review, and finding that the requirements of 24 [C.F.R.] Part 970 and Section 18 of the [United States Housing Act] have been met, the proposed demolition . . . is hereby approved."[14] The memorandum also included a general description of GHA's intended future use of the property.[15] On June 17, 2010, HUD issued a letter of amendment and clarification, restating its approval of GHA's demolition application and acknowledging that "a public housing authority . . . may demolish public housing property without prior approval from [HUD] if the property suffers abrupt damage from an act of God," that the Magnolia Homes and Cedar Terrace sites fell into this category, and that after demolishing them GHA had submitted a formal application "to evidence that the demolition was in compliance with Section 18 of the [United States Housing Act] and 24 [C.F.R.] Part 970."[16]

### C. The Planned Redevelopment

GHA's master plan for redevelopment—pending approval from HUD—seeks to replace each of the 569 public housing units lost during Ike in accordance with the terms of the LSLA settlement. As part of the master plan, GHA proposes to redevelop the former Magnolia Homes and Cedar Terrace

---

[13] R.4605-07.
[14] R.4615.
[15] R.4611-16.
[16] R.4608-09.

No. 14-40955

sites with 282 multi-family, mixed-income housing units, 144 of which would count toward replacement public housing units.[17]

## D. Procedural History

GHA's effort to redevelop the Magnolia Homes and Cedar Terrace sites met controversy. Individuals and the Galveston Open Government Project filed this lawsuit, seeking to enjoin the plan and arguing that by proposing redevelopment on former public housing sites the plan would actively concentrate poverty in already impoverished and racially segregated areas.[18] The original complaint named as defendants: the City of Galveston and GHA; GLO and the Texas Department of Housing and Community Affairs (collectively the "State Defendants"); and HUD and its secretary.[19]

The second amended complaint added as an additional plaintiff Tryshatel McCardell, an African-American resident of Galveston who lives nine blocks from the Cedar Terrace site. She claims injury from the construction of "public housing in [her] current neighborhood—a neighborhood that is already segregated—[because it] will further add to the segregation of the neighborhood—depriving her of interracial associations."[20]

---

[17] Before Ike, Magnolia Homes and Cedar Terrace comprised 133 units and 136 units, respectively—all 269 units were low-income public housing. The Magnolia Homes redevelopment would include 160 total units: 78 market rate unrestricted units; 18 project-based section 8 voucher units; and 64 public housing units. The Cedar Terrace redevelopment would include 121 total units: 59 market rate unrestricted units; 13 project-based section 8 voucher units; and 49 public housing units. R.4687; *see* R.2779-80. To achieve one-for-one replacement of the 569 units lost, in complement to redeveloping the Magnolia Homes and Cedar Terrace sites the master plan provides for the Texas General Land Office ("GLO") to develop 385 public housing units at scattered sites, 50 of which may be developed outside Galveston city limits on the mainland of Galveston County. "GHA Reconstruction Plan," GALVESTON       HOUSING       AUTHORITY,       *available       at* http://www.ghatx.org/dev_reconstruction.html (last visited April 1, 2015).

[18] R.22.

[19] Shaun Donovan was Secretary of HUD when this case was originally filed; Julian Castro later replaced Donovan at that post and was substituted for Donovan as a named defendant.

[20] R.2725-26.

No. 14-40955

Motions and orders ensued. In a thorough memorandum and order, the district court dismissed for lack of standing all plaintiffs except for McCardell.[21] McCardell then filed a third amended complaint, elaborating allegations in support of her "neighborhood standing" to challenge the plan[22] and requesting declaratory and injunctive relief on claims under the constitution, Title VIII of the Civil Rights Act of 1968, and the Administrative Procedure Act.[23] The district court dismissed the State Defendants on sovereign immunity grounds,[24] dismissed the APA claim,[25] granted McCardell's motion to nonsuit the constitutional claim,[26] granted the remaining defendants' joint motion for summary judgment on the Fair Housing Act claim,[27] and entered final judgment on August 13, 2014.[28]

Only McCardell appeals.[29]

## II.

McCardell first challenges the district court's dismissal of the Individual Plaintiffs and GOGP for lack of standing. As an initial matter, we hold that we lack jurisdiction to entertain these dismissals, for they did not appeal.

The Federal Rules of Appellate Procedure mandate that a notice of appeal must "specify the party or parties taking the appeal by naming each one in the caption or body of the notice . . . [and] designate the judgment, order, or part thereof being appealed . . . ."[30] Failure to name a party in a notice of appeal constitutes a fatal defect in that it fails to confer upon our court

---

[21] R.3728-63.
[22] R.3846-47.
[23] R.3857-60.
[24] R.3872-74.
[25] R.4460-63.
[26] R.4514.
[27] R.4685-97.
[28] R.4698-99.
[29] R.4700-02.
[30] Fed. R. App. P. 3(c)(1).

6

jurisdiction over that party. "It constitutes a failure of that party to appeal."[31] The Individual Plaintiffs and GOGP are not parties to this appeal because none filed notice of appeal.[32]

McCardell urges that it is irrelevant whether the Individual Plaintiffs or GOGP are parties because she has a personal stake in advancing an appeal of their dismissal. Even assuming, without deciding, that McCardell would have standing to bring such an appeal, we still would lack jurisdiction to review it. The notice of appeal filed by McCardell names only McCardell as plaintiff in its caption and states the following in body text: "Notice is hereby given that Tryshatel McCardell, Plaintiff in the above-named case, hereby appeals to the United States Court of Appeals for the Fifth Circuit the Final Judgment (D.E. 148) entered in this action on the 13th day of August, 2014."[33] The referenced final judgment names only McCardell as plaintiff and addresses only those claims she alone brought in the third amended complaint. It does not mention the Individual Plaintiffs or GOGP or any of the orders resulting in their dismissal from the suit. Although we "treat notices of appeal relatively liberally 'where the intent to appeal an unmentioned or mislabeled ruling is apparent and there is no prejudice to the adverse party,'"[34] no such intent is apparent here. By specifically designating only the district court's final judgment in her notice of appeal, McCardell exhibited no intent to appeal the district court's dismissal of the Individual Plaintiffs or GOGP.[35]

---

[31] *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 314 (1988).

[32] *Residential Council of Allen Parkway Vill. v. U.S. Dep't of Hous. & Urban Dev.*, 980 F.2d 1043, 1048-49 (5th Cir. 1993).

[33] R.4700-02.

[34] *R.P.* ex rel. *R.P. v. Alamo Heights Ind. Sch. Dist.*, 703 F.3d 801, 808 (5th Cir. 2012) (citation omitted).

[35] *See Warfield v. Fid. & Deposit Co.*, 904 F.2d 322, 325-25 (5th Cir. 1990).

No. 14-40955

III.

We must first address the threshold question of whether we have jurisdiction over McCardell's claim.[36] The district court held that McCardell alleged sufficient facts at the pleading stage to weather a motion to dismiss and proceed on the basis of "neighborhood standing."[37] We review that holding de novo, cognizant of the of Supreme Court's guidance that the standard used to establish standing is not constant but becomes gradually stricter in its demanded showing as the parties proceed through "the successive stages of [a] litigation."[38] "Although standing generally is a matter dealt with at the earliest stages of litigation, usually on the pleadings, it sometimes remains to be seen whether the factual allegations of the complaint necessary for standing will be supported adequately by the evidence adduced at trial."[39] McCardell bears the burden of establishing that she has standing to bring this appeal.[40]

A.

Article III of the Constitution limits our jurisdiction to certain justiciable "Cases" and "Controversies."[41] One element of the "case-or-controversy" requirement, among others, is that a plaintiff must establish that she has "standing" to sue[42]—that she "is entitled to have the court decide the merits of the dispute or of particular issues."[43] To establish Article III standing, a plaintiff must demonstrate an injury that is: (1) concrete, particularized, and

---

[36] *Martin v. Halliburton*, 618 F.3d 476, 481 (5th Cir. 2010).

[37] R.3742-53.

[38] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

[39] *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 115 n.31 (1979).

[40] *Martin*, 618 F.3d at 481.

[41] *Clapper v. Amnesty Intern. USA*, 133 S. Ct. 1138, 1146 (2013).

[42] *Id.* (internal quotation marks and citation omitted).

[43] *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

No. 14-40955

actual or imminent (so-called injury "in fact"); (2) fairly traceable to the challenged action; and (3) redressable by a favorable ruling.[44]

B.

After Congress passed the Fair Housing Act, the Supreme Court handed down a trilogy of cases in which it recognized that deprivation of "the benefits that result from living in an integrated community" is sufficient injury.[45] This theory of standing—deemed "neighborhood standing"—stems from the Court's conclusion that the harm caused by a racially discriminatory housing practice can, in some circumstances, extend beyond its immediate victim.[46] Rather than a claim of direct discrimination against oneself, neighborhood standing finds the requisite injury, albeit indirect and immediately visited upon a third-party, in "an adverse impact on the neighborhood in which the plaintiff resides."[47]

The Court first identified neighborhood standing in *Trafficante v. Metropolitan Life Insurance Company*,[48] where it found justiciable two apartment tenants' allegations that their landlord's "racial steering"[49] practices had resulted in "the loss of important benefits from interracial associations" in their apartment community.[50] The Court emphasized that the person excluded on account of his race "is not the only victim of discriminatory practices; it is . . . *the whole community*."[51] In *Trafficante* the standing analysis was relatively simple, as both plaintiffs resided in the "same housing unit that

---

[44] *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010).

[45] *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 375 (1982).

[46] *Id.*

[47] *Id.*

[48] 409 U.S. 205 (1972).

[49] The Court has defined "racial steering" in this context as "directing prospective home buyers interested in equivalent properties to different areas according to their race." *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 94 (1979).

[50] *Trafficante*, 409 U.S. at 209-10 (internal quotation marks and citation omitted) (emphasis added).

[51] *Id.* at 211

9

[was] charged with discrimination."[52]

Seven years later, in *Gladstone Realtors v. Village of Bellwood*,[53] the Court took up the resulting challenge of scope—whether a "12- by 13-block residential neighborhood" constituted a community from which residents enjoyed standing to challenge illegal racial steering practices.[54] Answering that question affirmatively, the Court held that the inquiry is the same regardless whether a "community is defined in terms of city blocks [or] apartment buildings": standing depends on "[t]he presence of a genuine injury ascertainable on the basis of discrete facts presented at trial."[55] The Court held that the plaintiffs had standing based on their allegations that racial steering had negatively affected the racial composition of their "relatively compact neighborhood."[56]

In *Havens Realty Corporation v. Coleman*,[57] the Court reaffirmed its recognition of neighborhood standing "based on the effects of discrimination . . . within a 'relatively compact neighborhood.'"[58] There, two residents of the Richmond, Virginia, metropolitan area alleged that a landlord's racial steering practices at an apartment complex in a Richmond suburb had deprived them of "the important social, professional, business, and economic, political, and aesthetic benefits of interracial associations that arise from living in integrated communities . . . ."[59] The Court, noting that it was implausible to conclude that discrimination within a single housing complex

---

[52] *Id.* at 209. We note that the apartment complex in *Trafficante* housed "about 8,200 residents." *Id.* at 206.

[53] 441 U.S. 91 (1979).

[54] *Id.* at 112-14.

[55] *See id.* at 114.

[56] *Id.* at 110, 114.

[57] 455 U.S. 363 (1982).

[58] *Id.* at 377 (quoting *Bellwood*, 441 U.S. at 114).

[59] *Id.* at 376.

could have palpable effects throughout an entire metropolitan area, remanded for further factual development, because the "extreme generality" of the residents' complaint had "not identified the particular neighborhoods in which they lived, nor established the proximity of their homes to the site of petitioners' alleged steering practices."[60]

These cases demonstrate that a constitutionally cognizable injury can arise from the deprivation of the social and economic benefits of living in an integrated and relatively compact community. Serving this principle, we in turn have held that denying "benefits of interracial associations" and "racial balance and stability" can constitute cognizable injury.[61] In *Broadmoor*, we held "that individual residents who live[d] inside the area targeted by real estate brokers for racial steering" had standing to bring suit under the Fair Housing Act.[62]

## C.

In reviewing standing at the summary judgment stage, any "specific facts . . . set forth by affidavit or other evidence . . . will be taken to be true."[63] The third amended complaint alleged that McCardell "is an impoverished African American resident" of Galveston who "currently lives approximately nine blocks from the proposed site of Magnolia Homes."[64] It added the following:

> [McCardell's] neighborhood is predominantly composed of racial minorities, and the new tenants of the public housing units of [the planned redevelopment] are estimated to be mostly racial minorities. There is also a high rate of poverty and those needing housing assistance in her neighborhood. Building new public

---

[60] *Id.* at 377-78.

[61] *Broadmoor Improvement Ass'n, Inc. v. Stan Weber & Assocs.*, 597 F.2d 568, 570 (5th Cir. 1979) (per curiam) (quoting *Bellwood*, 441 U.S. at 111)

[62] *Id.*

[63] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

[64] R.3846.

housing in her neighborhood will have an economic and racially segregative effect on her neighborhood . . . If Defendants [sic] plans move forward [ ] McCardell will be deprived of the social and professional benefits of living in an integrated society and the racial balance and stability of the neighborhood will be undermined. [ ] McCardell also presently suffers the stigmatic harm of living in a community whose members are subjected to segregation on the basis of prohibited classification by the Defendant's [sic] plan which is contrary to many laws . . . .[65]

The record also contains several reports of experts that support McCardell's allegations regarding the anticipated socioeconomic effects of the planned redevelopment on her neighborhood.[66]

We are persuaded that McCardell sufficiently alleged that the challenged action in this case would deny her the benefits of an integrated community within her relatively compact neighborhood. Unlike mine-run neighborhood standing cases, typically urging injury from past discriminatory practices, McCardell alleges only *future* injury. Appellees respond that two decisions of the Supreme Court since the *Trafficante-Gladstone-Havens* trilogy preclude constitutional recognition of such injury. Specifically, that McCardell has established neither "certainly impending" injury under *Clapper v. Amnesty International USA*,[67] nor "'likely,' as opposed to merely 'speculative,'" redressability under *Lujan v. Defenders of Wildlife*.[68] We consider each argument in turn.

---

[65] *Id.*

[66] *See, e.g.*, R.739-804 (Kirk McClure, *Analysis of Census Tracts of Galveston County, Texas*, September 24, 2013); R.688-738 (John A. Powell, *A Preliminary Analysis of the Galveston Public Housing Reconstruction* Plan, May 7, 2013); R.3509-26 (Jason Reece, et al., *Galveston After Ike: Moving Together Towards a Full Recovery*, December 2011).

[67] 133 S. Ct. 1138, 1147 (2013).

[68] 504 U.S. 555, 561 (1992) (citation omitted).

No. 14-40955

1.

*Clapper* held that "threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient."[69] There, attorneys and human rights organizations brought action seeking declaratory and injunctive relief from a provision of the Foreign Intelligence Surveillance Act that allowed surveillance of non-"United States persons" who were reasonably believed to be located outside the United States.[70] The plaintiffs' argument was premised on likely future harm caused by the statute—"Respondents believe that some of the people with whom they exchange foreign intelligence information are likely targets of surveillance under [the statute]."[71] The Court held that the plaintiffs' "theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending."[72] It identified the "speculative chain of possibilities"[73] as follows:

> (1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under [the statute] rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy [the statute's] many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of respondents' contacts; and (5) respondents will be parties to the particular communications that the Government intercepts.[74]

Appellees assert that because the planned redevelopment is both

---

[69] *Clapper*, 133 S. Ct. at 1147 (internal quotation marks and citation omitted).
[70] *Id.* at 1142-43.
[71] *Id.* at 1145.
[72] *Id.* at 1148.
[73] *Id.* at 1150.
[74] *Id.* at 1148.

inchoate and designed to be mixed income and to attract a variety of tenants, McCardell can only speculate as to whether, if redevelopment proceeds, it will deprive her of the social and economic benefits of diversity. Granted, McCardell's asserted injury is inescapably "speculative" in the sense that it is not yet felt. But unlike in *Clapper*, where the alleged injury depended on a long and tenuous chain of contingent events, the chain-of-events framework in this case involves fewer steps and no "unfounded assumptions."[75] McCardell's asserted injury would be concretely felt in the logical course of probable events flowing from an unfavorable decision by this court: (1) HUD approves the already-pending plan for redevelopment;[76] (2) redevelopment occurs according to the approved plan;[77] (3) segregation and minority- and poverty-concentration occur in McCardell's neighborhood as specifically anticipated in several expert reports contained in the record.[78]

---

[75] *Cf. Clapper*, 133 S. Ct. at 1148-49.

[76] This after having formally approved the underlying demolition under 42 U.S.C. § 1437p, in part based on the details of the proposed redevelopment.

[77] In an analogous redressability analysis the Supreme Court found a "substantial probability of materialization" following the removal of regulatory barriers to a planned development. *See Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977) ("If a court grants the relief [plaintiff] seeks, there is at least a 'substantial probability' that the [proposed] project will materialize, affording [him] the housing opportunity he desires . . . .").

[78] The following excerpt is representative of the extensive expert reports submitted by McCardell:

> The [planned redevelopment] will add public housing units to neighborhoods that already suffer from high concentrations of poverty exacerbating the problems that result from this social condition. These developments will confront a significant challenge in marketing units to middle- and upper-income households. If the developments fail to attract middle- and upper-income tenants, then the developments will further concentrate the poor in individual developments in poor neighborhoods. R.802 ((Kirk McClure, Ph.D, *Review and Conclusions on Public Housing Reconstruction on Targeted Census Tracts in the City of Galveston, Texas*, September 24, 2013). To develop mixed-income housing on the sites of the former public housing projects means locating these developments in tracts that are not enjoying strong demand for housing by upper-income households. The census tracts where the

No. 14-40955

Under *Lujan*, we take as true "specific facts . . . set forth by affidavit or other evidence."[79] McCardell asserts facts with more specificity and support than those found wanting in *Clapper*. We conclude that she has adequately alleged a threatened injury that is "certainly impending."[80] Bolstering this conclusion, as the district court below ably identified, numerous other courts have found that individual neighbors have standing to challenge *future* segregative effects of planned but yet unbuilt public housing projects.[81]

2.

Appellees persist that even assuming injury-in-fact McCardell cannot show that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"[82] This misapprehends our inquiry. Their argument appears to be that a favorable decision for McCardell "would have

---

developments are planned have high levels of poverty and are not racially or ethnically integrated. The research suggests that these characteristics will make mixed-income housing developments extremely difficult, perhaps even impossible, to successfully market to upper-income households. R.791-94 (Kirk McClure, Ph.D, *Analysis of the Census Tracts of Galveston County, Texas*, September 24, 2013).

[79] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

[80] *Clapper*, 133 S. Ct. at 1147.

[81] *See, e.g.*, *Jackson v. Okaloosa Cnty.*, 21 F.3d 1531 (11th Cir. 1994) (holding plaintiffs had standing to challenge siting process for new, unbuilt public housing project); *Alschuler v. Dep't of Hous. & Urban Dev.*, 686 F.2d 472 (7th Cir. 1982) (affirming neighborhood standing to challenge HUD's decision approving a preliminary proposal for development project); *Shannon v. U.S. Dep't of Hous. & Urban Dev.*, 436 F.2d 809, 817-18 (3d Cir. 1970) (affirming standing to challenge site selection for apartment project "about to be constructed," premised on allegation that siting "will adversely affect" plaintiffs in the future) (cited favorably in *Trafficante*, 409 U.S. at 111; and *Gladstone*, 441 U.S. at 114 n.28); *Glendale Neighborhood Ass'n v. Greensboro Hous. Auth.*, 901 F.Supp. 996, 1000 (M.D.N.C. 1995) (discussing *Jackson* and *Alschuler* and affirming standing of plaintiffs that alleged "they will be injured by development of the proposed public housing project"); *King v. Harris*, 464 F.Supp. 827, 832-33 n.14 (E.D.N.Y. 1979), *aff'd sub nom. King v. Faymor Dev. Co.*, 614 F.2d 1288 (2d Cir. 1979), *vacated*, 446 U.S. 905 (1980), *aff'd on remand*, 636 F.2d 1202 (2d Cir. 1980) (holding that plaintiffs, individuals living near a proposed housing project, had neighborhood standing to sue).

[82] Brief of Federal Appellees at 14 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

the ironic result of blocking investment in the area . . . [because] McCardell provides no basis for concluding that an empty lot will do more to improve diversity in her neighborhood than would a new mixed-income development."[83] A favorable ruling by this court, however, *would* redress the injury McCardell asserts by forbidding redevelopment according to the proposed plan. One need not speculate about empty lots or alternative plans or outcomes to conclude that McCardell has demonstrated "likely" redressability under *Lujan*.

D.

We hold that McCardell has Article III standing to bring her claim that the planned redevelopment will deprive her of the social and economic benefits that result from living in an integrated community

IV.

McCardell avers that the district court erred in dismissing the State Defendants as immune from suit under the Eleventh Amendment because Congress intended by the Fair Housing Act to abrogate their immunity. We disagree.

The Eleventh Amendment bars suits brought by private citizens against a state in federal court without the state's consent.[84] It is axiomatic that, as sovereigns, states and "arms of the state" possess immunity from suits brought under federal law.[85] Congress may abrogate a state's sovereign immunity only

---

[83] *Id.* at 17.

[84] U.S. CONST. amend. XI ("The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State."); *see generally Hans v. Louisiana*, 134 U.S. 1 (1890).

[85] *Northern Ins. Co. of New York v. Chatham Cnty., Ga.*, 547 U.S. 189, 193-94 (2006) ("[T]he phrase 'Eleventh Amendment immunity' . . . is convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment.") (citing *Alden v. Maine*, 527 U.S. 706, 713 (1999); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-99 (1984) ("[T]he principle of sovereign immunity is a constitutional limitation on the federal judicial power established in [Article] III . . . .").

if it (1) makes "unmistakably clear" its intent to do so and (2) acts pursuant to a constitutionally valid exercise of its power.[86]

It is undisputed that State Defendants here are arms of the state of Texas and Texas has not consented to suit brought under the Fair Housing Act. The question remains whether Congress validly abrogated Texas' sovereign immunity in enacting the Fair Housing Act. McCardell cannot clear the first hurdle of this inquiry. The language of the Fair Housing Act does not make "unmistakably clear" that Congress intended to abrogate. It contains no provision evidencing such intent. McCardell offers none, opting instead to devote the whole of her briefing on this issue to the second prong: whether Congress passed the Fair Housing Act pursuant to a constitutionally valid exercise of its power. But whether Congress did so bridges beyond, as the Act lacks an explicit provision allowing its enforcement by private right of action against a state.

Its want is made the more clear, by contrast, in remedial provisions tied to other aspects of civil rights legislation. For example, with regard to Title VI of the Civil Rights Act of 1964, which prevents discrimination by government agencies that receive federal funds, Congress provided by statute that "[a] state shall not be immune under the Eleventh Amendment of the Constitution of the United States from Suit in Federal court for a violation of . . . title VI of the Civil Rights Act of 1964 . . . ."[87] The Supreme Court has recognized that by this language Congress "expressly abrogated States' sovereign immunity against suits brought . . . to enforce Title VI."[88] No similar language exists in the provisions of the Fair Housing Act.

---

[86] *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726 (2003); *see Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 55 (1996).

[87] 42 U.S.C. § 2000d-7(a)(1).

[88] *See Alexander v. Sandoval*, 532 U.S. 275, 280 (2001); *see also Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 363-64 (2001) (holding that Congress indisputably

No. 14-40955

We hold that Congress did not make clear an intent to abrogate States' Eleventh Amendment sovereign immunity from suits brought under the Fair Housing Act, a conclusion reached by other courts considering the issue.[89]

V.

The district court granted summary judgment to the remaining defendants on McCardell's Fair Housing Act claim.[90] It concluded that McCardell's claim was precluded by a safe harbor provision found at 42 U.S.C. § 1437p(d), which provides:

> Notwithstanding any other provision of law, replacement public housing units for public housing units demolished in accordance with this section may be built on the original public housing location or in the same neighborhood as the original public housing location if the number of the replacement public housing units is significantly fewer than the number of units demolished.

The district court held that the "[n]otwithstanding any other provision of law" language contained in section 1437p(d) applied in this case to bar a Fair Housing Act claim against the rebuilding of units on former public housing sites because the demolition met the conditions requisite to invoke the safe harbor provision.

---

abrogated States' immunity from suits brought under the Americans with Disabilities Act by providing in 42 U.S.C. § 12202 that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a court] for a violation of this chapter").

[89] *See Morris v. Dehaan*, 1991 WL 177995, at *3 (6th Cir. Sept. 12 1991); *Brooks v. Oakland Univ.*, 2013 WL 6191051, at *2 (E.D. Mich. Nov. 26, 2013); *Sims v. Tex. Dep't of Hous. & Cmty. Affairs*, 2008 WL 4552784, at *1 (S.D. Tex. Oct. 7, 2008) ("[T]he states were not made 'persons' potentially liable for FHA violations." (citing 42 U.S.C. § 3602(d)); *Gregory v. S. Carolina Dep't of Transp.*, 289 F.Supp.2d 721, 724-25 (D.S.C. 2003); *Project Life, Inc. v. Glendening*, 139 F.Supp.2d 703, 711 (D. Md. 2001); *Welch v. Century 21 Chimes Real Estate*, 1991 WL 29950, at *1-*2 (E.D.N.Y. Feb. 27, 1991); *see also Boyd v. Browner*, 897 F.Supp. 590, 594-95 (D.D.C. 1995) ("[T]he Fair Housing Act does not 'unambiguously waive' the government's sovereign immunity defense . . . .").

[90] R.4690-97.

No. 14-40955

A.

We review de novo, applying the same standard as the district court.[91] Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[92] "An issue is material if its resolution could affect the outcome of the action."[93] We consider all facts and evidence in the light most favorable to the nonmoving party.[94]

B.

As an initial matter, the district court's interpretation and application of section 1437p comports with our plain-language reading of the statute. The section 1437p(d) safe harbor applies to the redevelopment of public housing on a demolished site if (1) the demolition was carried out "in accordance with" section 1437p and (2) "the number of replacement public housing units is significantly fewer than the number of units demolished."[95] If these conditions are met, the safe harbor applies to preclude a Fair Housing Act claim. McCardell does not contest on appeal that the number of replacement public housing units in the planned redevelopment would be "significantly fewer" than the number of units demolished as that standard is defined in relevant regulations.[96] Our inquiry is thus focused on the "in accordance with" prong. Relevant to this inquiry, the implementing regulations for section 1437p are codified at 24 C.F.R. § 970.1 *et seq.*[97] Among the implementing regulations, the

---

[91] *Haverda v. Hays Cnty.*, 723 F.3d 586, 591 (5th Cir. 2013).

[92] Fed. R. Civ. P. 56(a).

[93] *Boudreaux v. Swift Transp. Co. Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).

[94] *Haverda*, 723 F.3d at 591.

[95] 42 U.S.C. § 1437p(d).

[96] *See* 24 C.F.R. § 905.602(d)(5).

[97] *See generally* Demolition or Disposition of Public Housing Projects, 71 Fed. Reg. 62,354 (Oct. 24, 2006).

list of requirements for HUD approval of a PHA demolition application under section 1437p is located at 24 C.F.R. § 970.7. And relevant to this appeal, 24 C.F.R. § 970.31 provides that the development of "replacement public housing units . . . on the original public housing location . . . must [also] comply with [the provisions of] 24 [C.F.R. §] 905 . . . ."

The provisions of 24 C.F.R. § 905, in turn, contain general requirements related "to the development of public housing units to be included under an ACC and which will receive funding from public housing funds."[98] Part 905.602(d) provides that "[e]ach proposed site . . . for construction or rehabilitation of public housing *must be reviewed and approved by the [HUD] field office* as meeting [several] standards, as applicable."[99] This language indicates that a reviewing court's inquiry is limited to considering whether HUD reviewed and approved a proposed site as meeting each standard. It does not require or permit a reviewing court to second-guess HUD's determinations.

Part 905.602(d) lists eleven standards that HUD must consider with regard to a proposed site for construction.[100] The fifth listed standard tracks the language of the section 1437p(d) safe harbor and provides that "[n]otwithstanding the foregoing [four standards], after demolition of public housing units a PHA may construct public housing units on the original public housing site or in the same neighborhood if the number of replacement public housing units is significantly fewer than the number of public housing units demolished."[101] Because McCardell concedes that the planned redevelopment

---

[98] 24 C.F.R. § 905.600(a); *see id.* at § 905.602(d).

[99] *Id.* at § 905.602(d) (emphasis added).

[100] *Id.* at § 905.602(d)(1)-(11).

[101] *Id.* at § 905.602(d)(5). Subpart (d)(5) provides, in full:

(5) Notwithstanding the foregoing, after demolition of public housing units a PHA may construct public housing units on the original public housing site or in the same neighborhood if the number of replacement

meets the "significantly fewer" standard contained in subpart (d)(5), the express terms of that subsection provide that subparts (d)(1) through (d)(4) do not apply in this case. The remaining question for our purposes is whether HUD reviewed the proposed site for the planned redevelopment and approved it as meeting the standards listed at subparts (d)(6) through (d)(11).[102] The district court, in holding that the section 1437p(d) safe harbor applied as a matter of law, necessarily concluded that HUD did so and thus answered this question affirmatively.

## C.

McCardell challenges the district court's holding on two fronts. She first argues that a material fact issue remains as to whether the planned redevelopment complies with subpart (d)(6),[103] which requires HUD to affirm

---

public housing units is significantly fewer than the number of public housing units demolished. One of the following criteria must be satisfied:

(i) The number of public housing units being constructed is not more than 50 percent of the number of public housing units in the original development; or

(ii) In the case of replacing an occupied development, the number of public housing units being constructed is the number needed to house current residents who want to remain at the site, so long as the number of public housing units being constructed is significantly fewer than the number being demolished; or

(iii) The public housing units being constructed constitute no more than 25 units.

[102] Because McCardell does not appeal the dismissal of her APA claim challenging HUD's determination that the standards listed at subparts (d)(6) through (d)(11) were satisfied, we have no occasion to consider whether those standards were satisfied in actuality.

[103] McCardell makes passing reference to subparts (d)(7) through (d)(11) in briefing, but she offers no basis on which this court could conclude that summary judgment as to those subparts was improper. Nor do we find any basis in the record. The record indicates that the demolition and planned redevelopment complied with subparts (d)(7) through (d)(11).

that "[t]he site shall promote greater choice of housing opportunities and avoid undue concentration of assisted persons in areas containing a high proportion of low-income persons." We disagree. The record leaves no doubt that this requirement was met. After demolishing the Magnolia Homes and Cedar Terrace sites, GHA applied to HUD for formal approval of the demolition and the planned redevelopment. In its letter of approval, HUD explicitly considered the requirements set forth in the implementing regulations for section 1437p and concluded that the relevant requirements had been met.[104] With regard to subpart (d)(6), the provision at issue here, HUD later indicated that:

> . . . the [planned] redevelopment of both the Cedar Terrace and Magnolia Homes sites will affirmatively further fair housing and . . . the [planned] redevelopment of both sites will reduce the concentration of public housing units in operation on these two sites *and will also lower the concentration of poverty in these neighborhoods.*"[105]

This record evidence indicates conclusively that HUD reviewed the proposed site for the planned redevelopment and approved it as meeting the standard listed at subpart (d)(6). McCardell offers no relevant contrary evidence. Although she points to several expert reports reaching conclusions different from that reached by HUD, such evidence goes not to whether HUD reviewed and approved the proposed site in compliance with subpart (d), but instead attacks the wisdom of HUD's underlying determination. As discussed above,

---

[104] R.4611-4616 ("Based upon our review, [we find] that the requirements of 24 [C.F.R. §] 970 and Section 18 of the [United States Housing Act]."). As the district court correctly explained, Section 18 of the United States Housing Act of 1937, as amended by the Quality Housing and Work Responsibility Act of 1998, is codified at 42 U.S.C. § 1437p. *See* Veterans Affairs and HUD Appropriations Act, Pub. L. No. 105-276, 112 Stat. 2461, 2573 (1998) ("Section 18 of the United States Housing Act of 1937 (42 U.S.C. 1437p) . . . ."); *see also, e.g.*, 24 C.F.R. § 906.35 ("The provisions of section 18 of the 1937 Act (42 U.S.C. 1437p) . . . .").

[105] R.3547 (emphasis added).

No. 14-40955

the plain text of 24 C.F.R. § 905.602(d) does not permit us to second-guess HUD's conclusions in this context.

Arguing in the alternative, McCardell posits that even if record evidence demonstrates conclusively that the demolition was *approved* under section 1437p, it might have been *carried out* pursuant to a different section altogether. McCardell offers that the demolition might have been carried out pursuant to section 1437v, which provides that demolition of public housing undertaken in conjunction with a "main street revitalization or redevelopment project"[106] is not subject to the provisions of section 1437p,[107] and thus not entitled to the section 1437p(d) safe harbor. In support, McCardell points to a fragment of GHA's demolition application and asserts that GHA's use of the word "obsolete" in a general narrative heading,[108] without an express invocation of section 1437p, makes ambiguous whether the application was submitted pursuant to section 1437p or section 1437v, both of which refer to the demolition of "obsolete" public housing projects.[109]

---

[106] The purpose of section 1437v(a) "is to provide [grant] assistance to public housing agencies" to improve living environments, revitalize sites, provide low income housing, and build sustainable communities. *See* 42 U.S.C. § 1437v; *see generally* "Main Street Grants Notice of Funding Availability," HUD.GOV, *available at* (http://portal.hud.gov/hudportal/HUD?src=/program_offices/public_indian_housing/programs/ph/hope6/grants/mainstreet (last visited April 3, 2015) (providing an overview of the Main Street program). Section 1437v allows HUD to award grants to "carry out revitalization programs for severely distressed public housing." 42 U.S.C. § 1437v(d)(1).

[107] Section 1437v(g) provides:

> Any severely distressed public housing disposed of pursuant to a revitalization plan and any public housing developed in lieu of such severely distressed housing, shall be subject to the provisions of section 1437p of this title. Severely distressed public housing demolished pursuant to a revitalization plan *shall not be subject to the provisions of section 1437p of this title.* (emphasis added).

[108] The heading reads: "Circumstances that resulted in the units becoming vacant and relocation of residents: Hurricane Ike made units obsolete[.]" R.4528.

[109] 42 U.S.C. § 1437p(a)(1)(A)(i); *id.* at § 1437v(a)(1).

No. 14-40955

This second argument is without merit. The record contains a written declaration from the director of HUD's Public and Indian Housing Office of Urban Revitalization stating that "42 U.S.C. § 1437v does not apply to the development proposals submitted . . . by GHA for Cedar Terrace and Magnolia Homes."[110] The record contains no contrary evidence; nor does McCardell offer any. Finally, McCardell's assertion that GHA's use of the word "obsolete" creates ambiguity in the record, while creative, is unavailing.[111] Summary judgment was proper.

## VI.

The judgment of the district court is AFFIRMED.

---

[110] R.4618-21

[111] *See Boudreaux*, 402 F.3d at 540 ("Once the moving party has demonstrated the absence of a material fact issue, the non-moving party must go beyond the pleadings and designate specific facts showing that there is a general issue for trial. This burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." (internal quotation marks and citations omitted)).